UNITED STATES of America, Plaintiff,

v.

Earl K. H. KIM, Sr., also known as "the Old Man" and "E. K.", et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

Charles A. WONG, also known as "C. W.", et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

Earl K. H. KIM, Sr., also known as "the Old Man" and "E. K.", et al., Defendants.

Cr. Nos. 75–0154, 75–0155 and 76–0005.

United States District Court,
D. Hawaii.

June 9, 1976.

Howard T. Chang, Asst. U.S. Atty., Harold M. Fong, U.S. Atty., Honolulu, Hawaii, Michael L. Sterrett, Sp. Atty., San Francisco Strike Force, San Francisco, Cal., for plaintiff.

David C. Schutter, Honolulu, Hawaii, for defendants Earl K. H. Kim, Sr. and Charles A. Wong.

Ernest Y. Yamane, Honolulu, Hawaii, for defendants Sam Kobayashi, Thomas K. Arai, Michael H. Tanaka.

Wayne W. S. Luke, Honolulu, Hawaii, for defendant Peter J. Kim, Jr.

John S. Edmunds, Honolulu, Hawaii, for defendants Charles A. Wong, Robert R. Martinez.

Michael T. I. Kim, Honolulu, Hawaii, for defendants Ernest Nakamura, Joseph H. Kawamoto, Eugene Yamamoto.

Rogers M. Ikenaga, Honolulu, Hawaii, for defendants Marcello Molina, Patrick Sambueno.

Richard Turbin, Honolulu, Hawaii, for defendant Lawrence S. Motoda.

Steven E. Kroll, Honolulu, Hawaii, for defendant Wallace S. Furukawa.

Felix A. Maciszewski, Honolulu, Hawaii, for defendant Patrick Nagao.

Milton M. Motooka, Honolulu, Hawaii, for defendant Melvyn Wise.

Joseph A. Ryan, Honolulu, Hawaii, for defendant Clinton K. Burns.

Edward R. Lebb, Honolulu, Hawaii, for defendant Dennis H. Higa.

James Kawashima, Honolulu, Hawaii, for defendant Randall W. Y. Ng.

Jason F. Oliver, Honolulu, Hawaii, for defendant Kenneth K. Komoto.

Wilfred H. C. Youth, Honolulu, Hawaii, for defendant Nancy Yamada.

Lester L. Peetz, Honolulu, Hawaii, for defendant Isamu Toguchi.

Thomas Bowers, Honolulu, Hawaii, for defendant Joseph Barrozo, Jr.

Matthew S. K. Pyun, Jr., Honolulu, Hawaii, for defendant Thomas T. Nishigaya.

## MEMORANDUM AND ORDER SUPPRESSING CERTAIN EVIDENCE

SAMUEL P. KING, Chief Judge.

As part of their investigation into suspected gambling activities, agents of the Federal Bureau of Investigation (FBI) used an 800 millimeter telescope with a 60 millimeter opening to observe activities in defendant Peter Kim's apartment and on his balcony. The building from which the surveillance was conducted was approximately a quarter of a mile from Kim's building; there were no buildings in the line of sight located significantly closer to Kim's building.

With the telescope, the agents were able to see defendants Kobayashi and Nakamura on Kim's balcony and within his apartment. In addition, they observed Kim making numerous telephone calls while reading what the telescope revealed to be the J. K. Sports Journal. The latter was allegedly used in connection with Kim's operation of the "telephone spot" for a major gambling operation.

From a different vantage point ·in a building on the opposite side of, and approximately 160 feet from, Kim's building, a different group of agents kept under surveillance an outdoor terrace which connected the apartment building elevator in Kim's building with the entrance to his apartment. In the course·of this surveillance, the purpose of which was to keep track of who frequented Kim's apartment, the agents used a pair of high-powered (7 X 35) binoculars.

The information acquired during the surveillance of Kim's apartment was used both to establish probable cause for court approval of a wiretap on Kim's phone and, somewhat paradoxically, to demonstrate that the wiretap was necessary since the surveillance and other "normal" investigative procedures could not produce enough evidence to convict the suspected gamblers. See 18 U.S.C. § 2518(1)(c). Defendant Peter Kim is joined by all other defendants in moving to invalidate these and any other uses of the surveillance of Kim's apartment.

The defendants contend that using the artificial viewing aids constituted a search and that the search was unreasonable since no warrant had been obtained. See Cady v. Dombrowski, 413 U.S. 433, 439, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973).[1] The government's most forceful response is that since the activities in and around Kim's apartment were in plain view, and since all parties agree that the agents had a right to be where they were during the surveillance, no search took place. It would follow, of course, that no warrant was required.

Thus, the issue on which resolution of this motion turns is which, if any, of the agents' activities were searches within the meaning of the Fourth Amendment.

In Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), a case involving electronic eavesdropping on an individual placing a telephone call from a public telephone booth, the Supreme Court held that government agents are considered to have engaged in search activities when they intrude on an individual's privacy. See Katz v. United States, supra, 389 U.S. at 353, 88 S.Ct. 507. There can be no question, contrary to the government's assertion at oral argument, that the protection recognized by Katz includes protection against unreasonable visual intrusions. See United States v. Capps, 435 F.2d 637, 641, n. 7 (9th Cir. 1970) and State v. Bryant, 287 Minn. 205, 177 N.W.2d 800, 803 (1970). Visual intrusions can interfere with an individual's right to be left alone just as powerfully as the eavesdropping at issue in Katz.

Not all surveillances with visual aids, however, constitute invasions of privacy. There are cases upholding police surveillance with telescopes or binoculars of

---

1. No claim is made that any of the exceptions to the warrant requirement apply in this case.

non-private places. *See, e.g., United States v. Loundmannz*, 153 U.S.App.D.C. 301, 472 F.2d 1376 (1972) (observing defendant's bookmaking activities on the street); *United States v. Grimes*, 426 F.2d 706 (5th Cir. 1970) (observing defendants placing contraband in a car). *See also United States v. Minton*, 488 F.2d 37 (4th Cir. 1973). These cases do not answer the question of whether using artificial aids to observe activities within an individual's home intrudes on that individual's privacy and therefore constitutes a search.

We are not concerned here with police observations into a home which were made unaided by a telescope or binoculars. Nor are we deciding the extent to which an agent may "crane his neck, or bend over, or squat, . . . so long as what he saw would have been visible to any curious passerby." *See James v. United States*, 135 U.S.App.D.C. 314, 418 F.2d 1150, 1151, n. 1 (1969). At least two cases which have upheld unaided police observations into private premises have done so only after making clear that no artificial amplification devices were involved. *See, e.g., United States v. Fisch*, 474 F.2d 1071, 1078 (9th Cir. 1973) and *Ponce v. Craven*, 409 F.2d 621, 625 (9th Cir. 1969), *cert. denied*, 397 U.S. 1012, 90 S.Ct. 1241, 25 L.Ed.2d 424 (1970). Court approval of such warrantless observations might be considered the traditional rule.

On the other hand, several cases have considered and upheld the use of visual aids to detect activities in private premises. In *Fullbright v. United States*, 392 F.2d 432 (10th Cir.), *cert. denied*, 393 U.S. 830, 89 S.Ct. 97, 21 L.Ed.2d 101 (1969) the court upheld the introduction of evidence which government agents had gathered by looking into the defendant's shed with binoculars. The court stated that "observations from outside the curtilage of activities within are not generally interdicted by the Constitution. Indeed, to so hold might require passing officers to close their eyes to the commission of felonies on front door steps." *Id.* at 434. *See also Johnson v. State*, 2 Md. App. 300, 234 A.2d 464 (Ct. of Sp.App., 1967). Similarly, the Supreme Court of Pennsylvania upheld the warrantless use of binoculars by a police agent to look through the window of the defendant's shop. *See Commonwealth v. Hernley*, 216 Pa.Super. 177, 263 A.2d 904 (1970), *cert. denied*, 401 U.S. 914, 91 S.Ct. 886, 27 L.Ed.2d 813 (1971). The agent was approximately 35 feet from the defendant's window during the surveillance. The court held that "it was incumbent on the suspect to preserve his privacy from visual observation" by drawing his curtains. *See Commonwealth v. Hernley, supra*, 216 Pa.Super. at 181–182, 263 A.2d at 907.[2]

 This court respectfully declines to follow *Fullbright* and *Hernley*. After *Katz*, the concept of curtilage and the presence or absence of a physical intrusion can have "no constitutional significance" in determining whether or not a search has taken place. *See Katz v. United States, supra*, 389 U.S. at 353, 88 S.Ct. 507; *United States v. Holmes*, 521 F.2d 859, 865 (5th Cir. 1975). It is of the utmost significance, however, and this court so finds, that the sophisticated visual aids available to the government

**2.** The government also relies on dicta in two pre-Katz Supreme Court decisions which discuss the use of binoculars. In the first case, *United States v. Lee*, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927), Justice Brandeis wrote that the Coast Guard could examine a boat with a searchlight before boarding her. In the course of his opinion he wrote that "*such* use of a searchlight is comparable to the use of a marine glass or a field glass." *Id.* at 563, 47 S.Ct. at 748. (emphasis added). Thus, to the extent that this dictum is controlling, it relates to looking at something (the deck of a boat at open sea) regarding which there was no expectation of privacy.

*On Lee v. United States*, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952) also contains dicta to the effect that the use of "bifocals, field glasses or the telescope to magnify the object of a witness' vision is not a forbidden search or seizure, . . . .." *Id.* at 754, 72 S.Ct. at 972. This statement was made in the context of deciding whether evidence gathered by a "false friend" who had been wired for sound by the police could be introduced. The Court's statement regarding visual aids cannot be considered as controlling all uses of visual aids under all circumstances.

can intrude on individual privacy as severely as the electronic surveillance in *Katz* or the wiretapping in *Berger v. State of New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967).[3] It is inconceivable that the government can intrude so far into an individual's home that it can detect the material he is reading and still not be considered to have engaged in a search. *See also* Amsterdam, Perspectives on the Fourth Amendment, 58 Minn.L.Rev. 349, 404 (1974). If government agents have probable cause to suspect criminal activity and feel the need for telescopic surveillance, they may apply for a warrant; otherwise, they have no right to peer into people's windows with special equipment not generally in use.

█ The quest for evidence directed at Kim's apartment is not exempted from Fourth Amendment regulation by the plain view doctrine. *Compare Hester v. United States*, 265 U.S. 57, 59, 44 S.Ct. 445, 68 L.Ed. 898 (1924). A "plain" plain view of Kim's apartment was impossible; only an aided view could penetrate. In view of the powerful technology used by the law enforcement agents in this case, the "plain" in plain view must be interpreted as permitting only an unaided plain view.[4]

The government requests that the court judicially note recent newspaper articles which describe the reportedly increasing use by private citizens of telescopes to peer into high-rise apartment and condominium windows. From this evidentiary premise the court is apparently to conclude that Kim "knowingly exposed" his activities to public viewing and therefore cannot claim that the government surveillance invaded his privacy.

█ These articles, even if true, can have no bearing on whether Kim's activities were in plain view and therefore not private. The fact that Peeping Toms abound does not license the government to follow suit. In the particular context of this case, lack of concern about intrusions from private sources has little to do with an expectation of freedom from systematic governmental surveillance. *Cf. People v. Krivda*, 5 Cal.3d 357, 367, 96 Cal.Rptr. 62, 69, 486 P.2d 1262, 1268 (1971). Government agents occasionally engage in surveillance with more zeal and for different purposes than private citizens. *See generally*, Select Committee to Study Governmental Operations with Respect to Intelligence Activities, S.Rep.No. 94–755, 94th Cong., 2d Sess. (1976).

█ It is urged that Kim had no subjective expectation of privacy since he did not draw his curtains and also because he himself used binoculars from his own window, allegedly to determine if he was under surveillance. Without a subjective expectation of privacy Kim supposedly forfeits his Fourth Amendment rights under the first prong of the two-pronged test set out in Justice Harlan's influential concurrence in *Katz*.[5] Such an interpretation is totally at war with Fourth Amendment values. As Professor Amsterdam has observed,

> An actual, subjective expectation of privacy . . . can neither add to, nor can its absence detract from, an individual's claim to fourth amendment protection. If it could, the government could diminish each person's subjective expec-

---

**3.** *See also United States v. Holmes*, 521 F.2d 859 (5th Cir. 1975) (planting a "beacon" on defendant's car to facilitate tracking him was a search); *United States v. Solis*, 393 F.Supp. 325 (C.D.Cal.1975) (olfactory intrusion by dog trained to detect drugs was a search). *Compare United States v. Bronstein*, 521 F.2d 459 (2d Cir. 1975).

**4.** This case does not present a situation where private parties have a plain (unaided) view of the defendant's premises but government agents are forced to use visual aids because they were not able to get as close to the defendant's premises as the private parties.

**5.** Justice Harlan's "understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Katz v. United States, supra*, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring). *See also United States v. Fisch, supra*, 474 F.2d at 1076.

tation of privacy merely by announcing half-hourly on television that 1984 was being advanced by a decade and that we were all being placed under comprehensive electronic surveillance . . .. Fortunately, neither Katz nor the fourth amendment asks what we expect of government. They tell us what we expect of government.

Amsterdam, *supra*, 58 Minn.L.Rev. at 384.

██ At most, the first prong of Justice Harlan's test refers to that portion of the Court's opinion in *Katz* which stated that activities knowingly exposed to the public were not protected by the Fourth Amendment. *See Katz v. United States,. supra*, 389 U.S. at 351, 88 S.Ct. 507. This court has found that Kim did not knowingly expose his activities to public viewing; his use of binoculars, for whatever reason, does not change this result. Were Kim's actions interpreted as a renunciation of his expectation of privacy, the result might be that anyone taking steps to protect his privacy would run the risk of being considered to have forsaken it.

██ Similarly, whether and when Kim's curtains were open or shut has no relevance in this case. By opening his curtains, an individual does not thereby open his person, house, papers and effects to telescopic scrutiny by the government. *Compare, Ponce v. Craven, supra*, 409 F.2d at 625, *Commonwealth v. Hernley, supra*, 216 Pa.Super. at 181–182, 263 A.2d at 907, and *cf.* T. Taylor, Two Studies in Constitutional Interpretation 74–75 (1969). One need not necessarily agree with the results in several recent cases concerning unconventional search techniques, *see* note 3 *supra*, to recognize that as the technological capability of law enforcement agencies increases, the Fourth Amendment must likewise grow in response. To permit governmental intrusions of the sort at issue in this case to remain uncontrolled would violate the basic foundations of privacy, security and decency which distinguish free societies from controlled societies.

It would be foolish to pretend that the Fourth Amendment addresses the search at issue in this case with any particularity or clarity. There is welcome room for legislation or perhaps enlightened internal regulation by the law enforcement agencies themselves in working out the procedures governing the issuance, execution and return of search warrants for visually aided searches. As an initial proposition, it can be expected that applications for warrants for this type of search should, in addition to demonstrating probable cause for the search,[6] also state the days and hours during which the surveillance is planned. After the surveillance is completed, the executing agents should tell the court and the surveillance subject the hours during which the surveillance in fact took place and, if possible, give a meaningful narrative of what was observed. *Cf. United States v. Chun*, 503 F.2d 533, 536–538 (9th Cir. 1974). Whether agents must "minimize" their scrutiny of activities or objects unrelated to the purposes of the search is left for decision in an appropriate case; wise and decent law enforcement would dictate restraint in this area. *See generally*, Comment, Post-Authorization Problems in the Use of Wiretaps: Minimization, Amendment, Sealing, and Inventories, 61 Cornell L.Rev. 92, 94 (1975).

██ The foregoing analysis is applicable only to the observations of activities within Kim's apartment. The surveillance of activities on his balcony, if standing alone, might very well not have invaded Kim's privacy and therefore not have constituted a search. *Cf. United States v. Magana*, 512 F.2d 1169, 1170 (9th Cir. 1975). Nevertheless it would be extremely difficult to split

---

**6.** It can be expected that to establish probable cause in this context the government must demonstrate that evidence of criminal activity will be obtained by executing the proposed surveillance. *Cf. United States v. Feldman*, 535 F.2d 1175, No. 75–1303 (9th Cir. 1976). This case does not present the question of whether other investigative techniques must be tried before aided visual surveillance into a suspect's home can be approved. *See id.* at 1178–1179.

the hairs involved in determining which evidence was derived solely from surveillance of the balcony. Therefore, on the record before the court at this time, all the evidence obtained from the telescopic surveillance of Kim's apartment and balcony must be suppressed. *Cf. United States v. Fisch, supra,* 474 F.2d at 1077.

There is no reason to suppress the fruits of the surveillance of the terrace leading from the elevator to Kim's apartment. The terrace is a shared walkway, similar in many respects to a hallway. It does not belong to any of the defendants and no defendant could have had a legitimate expectation that his comings and goings via the terrace were not being observed.

Defendant Peter Kim has standing to object to the warrantless search of his apartment and his motion to suppress the fruits of the surveillance of his apartment is granted.

After suppressing this evidence, however, the affidavit supporting the application for the wiretap order still demonstrates the probable cause required by 18 U.S.C. § 2518. *See United States v. Feldman,* 535 F.2d 1175, No. 75–1303 (9th Cir. 1976).

Since the government has agreed not to introduce the suppressed evidence against any defendants at trial there remains no reason to decide which other defendants, if any, have standing to seek suppression of the fruits of the surveillance of Kim's apartment.

It is so ORDERED.