UNITED STATES of America,
Appellant,

v.

Miguel Angel TABORDA, Appellee.

No. 1536, Docket 80–1251.

United States Court of Appeals,
Second Circuit.

Argued Aug. 22, 1980.

Decided Nov. 24, 1980.

Edward R. Korman, U. S. Atty., E.D. N.Y., Brooklyn, N.Y. (David Eisenberg, Asst. U. S. Atty., E.D.N.Y., Brooklyn, N.Y.), for appellant.

Charles L. Weintraub, New York City, for appellee.

Before NEWMAN and KEARSE, Circuit Judges, and DUMBAULD,* District Judge.

KEARSE, Circuit Judge:

This appeal presents the question whether the government surveillance of a person in his own home by means of a telescope violates his right to be free from unreasonable searches and seizures under the Fourth Amendment to the Constitution. The United States appeals from an order of the

---

* The Honorable Edward Dumbauld, Senior Judge of the United States District Court for the Western District of Pennsylvania, sitting by designation.

United States District Court for the Eastern District of New York, Eugene H. Nickerson, Judge, granting the motion of defendant–appellee Miguel Angel Taborda to suppress evidence seized at his residence pursuant to a search warrant issued on the basis of an affidavit describing observations made, at least to some extent, by means of a high–powered telescope. For the reasons set forth below we vacate the order of suppression and remand for further proceedings.

## I

On October 24, 1979, agents of the Drug Enforcement Administration ("DEA") entered and searched Taborda's residence at Apartment 1G, 139–55 35th Avenue, Flushing, New York ("Apartment 1G"), and seized various items pursuant to a warrant authorizing the entry and search. The items seized included several packets of cocaine, more than $10,000 in cash, and paraphernalia used to "cut" and package co-

caine. Taborda was arrested and eventually was indicted by a Grand Jury on one count charging possession with intent to distribute approximately 230 grams of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (1976).[1]

Shortly after his indictment, Taborda moved under Fed.R.Crim.P. 41 for an order suppressing any evidence seized from his person or Apartment 1G. The premise of this motion was that the search warrant had been issued on the basis of an affidavit which described observations of Apartment 1G through a high–powered telescope, and that the use of the telescope itself, without prior issuance of a warrant, violated Taborda's Fourth Amendment right to be free from unreasonable searches and seizures.

### The Affidavit Supporting the Warrant

The search warrant for Apartment 1G was issued on the basis of an affidavit prepared by DEA agent James G. Deignan. The affidavit, pertinent portions of which are quoted in the margin,[2] stated that on

---

1. Later on the day of Taborda's arrest, Elsy Sanchez and Orlando Morales were arrested when they returned to Apartment 1G. All three defendants were arraigned on October 25, 1979, and were released on personal recognizance bonds. Sanchez and Morales thereafter left the jurisdiction of the court and returned to Colombia. Taborda remained in this country and is presently incarcerated, apparently against the risk that he will be deported by the Immigration and Naturalization Service if he is released.

2. After reciting that surveillance of Apartment 1G had been conducted from Apartment 3G "at times" by means of "a Monolux # 4352 telescope with a 20 mm viewer," the affidavit stated as follows:

3) At approximately 8:00 p. m. on October 4, 1979 Detective Robert Bisbee observed on a table in the kitchen of the PREMISES KNOWN AS 139–55 35th AVENUE, APARTMENT 1G, FLUSHING, NEW YORK a quantity of baggies and two jars labelled "Inositol".

4) Based upon his experience, your deponent knows that Inositol is a substance used to dilute cocaine.

5) Detective Bisbee and other DEA agents observed two males and a female seated at the kitchen table. The two males were cutting off the ends of small black objects (about 4 inches tall) which resembled chess pieces and emptying white powder from

these objects into a plastic bag. (A total of over 100 of these black objects was opened in this manner.) In addition to this plastic bag Detective Bisbee and other Drug Enforcement Administration agents observed a second clear plastic bag containing white powder on the window sill.

6) During the procedure described in paragraph 5, the two males sat next to the open kitchen window. They would occasionally draw their heads back, grimace and wave their hands in front of their faces as if to disperse an offensive odor.

7) Based upon experience your deponent is aware that cocaine is frequently diluted with substances having offensive odors.

8) During the procedure described in paragraph 5, the two males touched their faces only with the backs of their hands.

9) Following the aforesaid procedure, the two males washed their hands with a honey–colored liquid which was contained in a large jar further contained in a paper bag on the kitchen floor.

10) At approximately 10:00 p. m., after the aforesaid procedure was completed, the aforesaid individuals left the apartment. One of the males who had been seated at the table appeared to be carrying an object inside his jacket.

11) At approximately 6:55 p. m. on October 10, 1979 Detective Bisbee observed (by the same means described above) one of the individuals described above sitting at the

October 4, 10, and 23, 1979, DEA agents had conducted surveillance of Apartment 1G from an apartment directly across the street, viz., Apartment 3G at 139–50 35th Avenue, Flushing, New York ("Apartment 3G"). It noted that the surveillance had been conducted "at times by means of a high–powered telescope" located in Apartment 3G.

The affidavit recounted that the agents had observed, *inter alia*, a quantity of baggies and two jars labelled "Inositol"–a substance Deignan knew to be a diluent for cocaine; a clear plastic bag containing white powder on the kitchen window sill of Apartment 1G; two men cutting the ends off of more than 100 small black objects and emptying white powder from those objects into a plastic bag; the two men occasionally drawing their heads back and grimacing, and waving their hands in front of their faces as if to dispel an odor (Deignan noted that cocaine is frequently diluted with substances having offensive odors); and one or more persons sifting white powder through a strainer and transferring white powder from larger bags to smaller bags. There was no indication in the affidavit as to what observations were made by means of the telescope and what observations were made without its assistance.

*The Suppression Hearing*

Judge Nickerson held an evidentiary hearing at which he received the testimony of three DEA agents involved in the surveillance and an investigator retained by the defendant. The principal witness for the government was New York Police Detective Robert Bisbee who was assigned to the DEA Task Force. Bisbee, who had made most of the October 4 and 10 observations described in Deignan's affidavit, testified that on those dates the weather was clear, Apartment 1G was well lit, and its kitchen window was open with its blinds up and its curtains open. Bisbee stated that most of his observations, including the following, were made without the aid of the telescope: he observed Taborda and another man seated at the kitchen table in Apartment 1G, opening packages of white powder and transferring the powder to bags of a different size, opening small (3–4 inches) dark cylindrical objects and dumping white powder from them into plastic bags; he saw one of the men place a plastic bag containing white powder on the window sill; he saw Taborda stick his head out of the window as if to get fresh air, and saw both men wipe their eyes frequently with the backs of their hands as if their eyes were tearing. Bisbee testified that he used the telescope only to help him count the small dark objects from which white powder was being removed (thus aided he counted four rows of 26, or 104–106 altogether), and to allow him to read the legends on containers and implements he had observed but could not read without the aid of the telescope to see what was happening in Apartment 1G.

kitchen table of the PREMISES KNOWN AS 139–55 35th AVENUE, APARTMENT 1G, FLUSHING, NEW YORK. Dective [sic] Bisbee observed the individual open several bags containing white powder, sift them through a strainer and place the white powder in smaller clear plastic bags. Upon completion of this procedure the individual put the bags of white powder and other paraphernalia away.

12) At approximately 4:50 p. m. on October 23, 1979 Police Officer Berk and Detective Gerald Kieran observed (by the same means described above) two of the individuals described above at the kitchen table of the PREMISES KNOWN AS 139–55 35th AVENUE, APARTMENT 1G, FLUSHING, NEW YORK. The officers observed the individuals empty a quantity of white powder into a clear plastic bag which they sealed with a tie. Surveillance was conducted until midnight and neither of these individuals was observed to leave the apartment. No surveillance was conducted on 10/24 prior to the issuance of this search warrant.

WHEREFORE, your deponent respectfully requests that a search warrant issue to your deponent or any Special Agent of the Drug Enforcement Administration authorizing him to enter with the proper assistance and to search the PREMISES KNOWN AS 139–55 35th AVENUE, APARTMENT 1G, FLUSHING, NEW YORK and there to seize any cocaine found therein and any strainers, baggies, diluants [sic] and other narcotics parapharnalia [sic] which constitute evidence and fruits or instrumentalities of the crime of illegal possession of a controlled substance.

New York Police officers Gerald Kieran and Stephen Berk, who also were assigned to DEA, testified, *inter alia*, that they made observations of activity in Apartment 1G on October 23. Kieran stated that on that date he conducted surveillance from Apartment 3G for nearly six hours, making no use of the telescope. He saw two persons sitting at the kitchen table in Apartment 1G transferring white powder from one clear plastic bag into another. Berk testified that he made the same observation, with and without use of the telescope.

As to the configuration of 139-55 35th Avenue and the distances involved, Bisbee testified that Apartment 1G is above the street level, although less than a full story above it. The entrance to Number 139 55 is topped by a slanting roof which partially obscures windows in Apartment 1G. Thus, much of the interior of Apartment 1G is not visible from the street. The building is set back from the street and its base is approximately 189 feet from the base of Number 139–50. Apartment 3G is on the third floor of Number 139–50 and is about one and one–half stories higher than Apartment 1G. The two apartments are thus about 190 feet apart.[3]

The testimony of the agents revealed that at the beginning of October the landlord of Number 139–50 had given them permission to use Apartment 3G. Surveillance of Apartment 1G had begun shortly thereafter, and continued every weekday between October 4 and October 10, and at least 2–3 days a week thereafter until October 24. The telescope, which the government states had a magnification power of 36,[4] was brought to Apartment 3G on the first or second day of the surveillance, so that the agents could read the labels on

containers that Bisbee had seen in Apartment 1G. There were usually two or more agents observing from Apartment 3G, and the telescope was in virtually constant use by one of them. All of the agents discussed their observations.

The defense called as a witness Kenneth Bynoe, a private investigator who had been a police sergeant for sixteen years. Bynoe and Taborda's attorney had taken photographs of Number 139 -55 from its driveway and from the sidewalk in front; these photographs were received in evidence. Bynoe testified that if a person were sitting at the window end of the kitchen table in Apartment 1G, it would not be possible from the street to see into the kitchen beyond that person. Bynoe had also been inside Apartment 3G and had attempted to take photographs from there, but those photographs did not "come out." He did not offer testimony as to the visibility of the interior of Apartment 1G from Apartment 3G.

*The Decision To Suppress*

The district court granted Taborda's motion to suppress the evidence seized pursuant to the search warrant. Judge Nickerson ruled, on the basis of *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and *United States v. Kim*, 415 F.Supp. 1252 (D.Haw.1976), that "the government must obtain judicial sanction before using a telescope." 491 F.Supp. at 52. Rejecting any subjective test as to privacy expectations, the court stated as follows:

> This court reads the *Katz* case to mean, as a minimum, that the people may demand privacy unless a policeman can see or hear them from a place accessible to

---

**3.** Assuming that the bases of the two buildings are at the same level, and assuming normal story–height of ten feet, application of elementary principles of geometry reveals that the distance between the two apartments would be approximately 189.59 feet ($=\sqrt{189^2 + 15^2}$). To the extent that the base of Taborda's building is lower or higher than the base of Number 139 50, the distance between the windows of Apartment 1G and Apartment 3G would be slightly more or less, respectively, than 189.59 feet.

**4.** The record on appeal is unclear as to the precise magnifying power of the telescope. Prior to oral argument the government contended that its magnification power was twelve, and Taborda contended that it was much greater. At oral argument the government conceded that its earlier computations were in error and that new computations indicated that the actual magnification power was thirty six.

those members of the public not preternaturally inquisitive.

(*Id.* at 53.)

The court observed that the affidavit underlying the search warrant did not state "which, if any, of the observations were made with unaided eyes" (*id.* at 51), nor indicate the distance between Apartments 1G and 3G. Despite having received testimony at the hearing as to what was observed without aid of the telescope, the court granted the motion to suppress on the ground that the affidavit was insufficient to draw such distinctions: "so far as the affidavit reveals, every fact critical to a showing of probable cause might have been observed exclusively through the telescope." (*Id.* at 51.) Judge Nickerson concluded that even if the agents had been able to see Taborda from Apartment 3G, "we must assume that without the telescope they could not have determined what he was doing." (*Id.* at 53.).

This appeal followed pursuant to 18 U.S.C. § 3731 (1976).

## II

Warrantless searches are, "subject only to a few specifically established and well–delineated exceptions," *per se* unreasonable and are therefore prohibited by the Fourth Amendment. *Katz v. United States, supra,* 389 U.S. at 357, 88 S.Ct. at 514; *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031–32, 29 L.Ed.2d 564 (1971). The threshold question in the present case is whether observation by means of a high–powered telescope constitutes the type of intrusion against which the Fourth Amendment protects. The answer depends on whether such surveillance violated reasonable expectations of privacy.

The only Supreme Court discussions of the constitutional implications of surveillance with optical devices are dicta in two elderly cases, in which, as the government puts it, the Court accepted it "as a given" that use of such devices did not constitute an unreasonable search and seizure. *See*

*On Lee v. United States,* 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952); *United States v. Lee,* 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927). In *Lee,* the Court considered the use of a search light by Coast Guard officers to observe the deck of a vessel at sea. The use of the light was upheld with the observation that "[s]uch use of a search light is comparable to the use of a marine glass or a field glass. It is not prohibited by the Constitution." 274 U.S. at 563, 47 S.Ct. at 748. In *On Lee,* the Court dealt with the use of a radio transmitter to overhear a conversation between the defendant and an undercover agent. The Court observed that the defendant was talking "indiscreetly" with someone he trusted, who was lawfully on his premises; and the fact that he was overheard by means of the transmitter and a receiver rather than by an agent simply standing outside an open window was held immaterial to Fourth Amendment analysis. Again the Court analogized to visual aids:

The use of bifocals, field glasses or the telescope to magnify the object of a witness' vision is not a forbidden search or seizure, even if they focus without his knowledge or consent upon what one supposes to be private indiscretions.

343 U.S. at 754, 72 S.Ct. at 972.

While these statements were dicta, they were entirely consistent with Fourth Amendment analysis then prevailing, which depended heavily on common law concepts of trespass. Under those precepts, emphasis was laid on such questions as whether or not the agents had physically penetrated the subject's property, *see, e. g., Silverman v. United States,* 365 U.S. 505, 512, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 (1961); *Goldman v. United States,* 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942), or were otherwise within the curtilage, *see Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924). *See generally* 1 La Fave, *Search and Seizure: A Treatise on the Fourth Amendment* 257 (1978); Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn.L.Rev. 349, 357 (1974).

In 1967, however, with the decision in *Katz v. United States, supra,* Fourth Amendment analysis entered a new era as the Court held that trespass concepts were no longer controlling. *Katz* ruled that the government's listening to one side of a telephone conversation by means of electronic equipment placed on the outside of a telephone booth located in a public place was a search in violation of the Fourth Amendment. Justice Stewart, writing for the Court, stated that notions of protected areas were no longer necessarily useful, observing that

> [w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.... But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

389 U.S. at 351–52, 88 S.Ct. at 511–12. The Court held that the evidence gleaned from the agents' electronic eavesdropping at the booth could not be used against Katz at his trial because the use of the device "violated the privacy upon which he justifiably relied while using the telephone booth and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment." *Id.* at 353, 88 S.Ct. at 512. Justice Harlan, concurring, distilled from *Katz* and its antecedents "a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Id.* at 361, 88 S.Ct. at 516.[5]

At first glance Justice Harlan's formulation may appear to require, in part, that a person's actual state of mind be determined. The use of a subjective test as to expecta-

tions of privacy has been criticized by some courts and commentators on Orwellian grounds, that is, that it would be possible for the government by edict or by known systematic practice to condition the expectations of the populace in such a way that no one would have any real hope of privacy. *See* Orwell, *1984* (1949); *United States v. Kim,* 415 F.Supp. at 1256–57; Amsterdam, *supra* at 384. We agree that a purely subjective criterion is not appropriate, and we do not believe it is called for by *Katz.* We note that in his opinion in *Katz,* Justice Harlan's first factor was not precisely an actual expectation of privacy; it was rather the *exhibition* of an actual expectation of privacy. But the requirement that an expectation be "exhibited" is a requirement that "transcend[s] the ... subjective," *see United States v. White,* 401 U.S. 745, 786, 91 S.Ct. 1122, 1143, 28 L.Ed.2d 453 (1971) (Harlan, J., dissenting). We take this first factor to mean in essence that the defendant must have acted in such a way that it would have been reasonable for him to expect that he would not be observed. This, plainly, is an objective rather than a subjective requirement.

The second part of Justice Harlan's formulation, *i.e.,* that the privacy "expectation be one that society is prepared to recognize as 'reasonable',", appears to focus less on a person's actions and more on the place in which he acts. While Justice Harlan agreed with the majority that "the Fourth Amendment protects people, not places," he observed that the determination of what protection is given "[g]enerally ... requires reference to a 'place.'" *Katz v. United States, supra,* 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring); *see id.* at 351, 88 S.Ct. at 511 (opinion of the Court).[6] He

---

**5.** The opinions in *United States v. White,* 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971), revealed that four Justices believed that *Katz* did not overrule the holding in *On Lee v. United States, supra,* to the extent that the latter did not rely on trespass analysis, *see id.* at 750, 91 S.Ct. at 1125 (opinion of White, J., joined by the Chief Justice and Justices Stewart and Blackmun), and that four Justices believed that *Katz* completely overruled *On Lee. See id.* at 755, 91 S.Ct. at 1127 (Brennan, J., concurring in

result); *id.* at 758–64, 91 S.Ct. at 1129 (Douglas, J., dissenting); *id.* at 768–69, 773–81, 91 S.Ct. at 1134, 1136–1140 (Harlan, J., dissenting); *id.* at 796, 91 S.Ct. at 1148 (Marshall, J., dissenting).

**6.** *Cf. Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978) ("capacity to claim the protection of the Fourth Amendment depends ... upon whether the person who claims the protection of the Amendment

recognized, as did the majority, that there are places in which a person is "entitled" to assume that he will have privacy. *Id.* at 361, 88 S.Ct. at 517 (Harlan, J., concurring); *see id.* at 352, 88 S.Ct. at 511 (opinion of the Court). Thus the second branch of Justice Harlan's formulation, which is to some degree intertwined with the first branch, requires that the action occur in a place in which society is prepared, because of its code of values and its notions of custom and civility, to give deference to a manifested expectation of privacy.

 Analysis of telescopic surveillance pursuant to the *Katz* tests [7] means that the fact that the area observed by the agents is the interior of a residence is significant, for "a man's home is, for most purposes, a place where he expects privacy . . . ." *Id.* at 361, 88 S.Ct. at 516 (Harlan, J., concurring). The very fact that a person is in his own home raises a reasonable inference that he intends to have privacy, and if that infer-

ence is borne out by his actions, society is prepared to respect his privacy. But the inference may be rebutted by the person's own actions. If in his home he conducts activities or places objects in such a way that the activities or objects are seen by the unenhanced viewing [8] of persons outside the home, located where they may properly be,[9] such observations transgress no Fourth Amendment protection because "no intention . . . has been exhibited" by the householder to prevent the unenhanced viewing of others. *Id.* (Harlan, J., concurring); *id.* at 351, 88 S.Ct. at 511 (opinion of the Court). Absent exposure to such unenhanced viewing, however, we do not believe the inference of intended privacy at home is rebutted by a failure to obstruct telescopic viewing by closing the curtains. *See United States v. Kim, supra; cf. People v. Arno*, 90 Cal.App.3d 505, 153 Cal.Rptr. 624 (1979) (office building).[10] The vice of telescopic

has a legitimate expectation of privacy in the invaded place.")

7. We think it too clear for extended discussion that the principles enunciated in *Katz* are applicable to situations involving visual, as well as auditory, surveillance. We reject the government's notion that because elementary telescopes have been in use since 1608 their use is significantly less intrusive than the use of more modern auditory devices.

8. By terms such as "naked eye" and "normal unenhanced vision" we do not intend to exclude vision as corrected by eyeglasses or contact lenses.

9. Whether unenhanced viewing would implicate the Fourth Amendment would depend on whether the viewer properly occupies his vantage point. A trespass ordinarily would make the viewing unlawful but, as we indicated in *United States v. Agapito*, 620 F.2d 324, 331 (2d Cir. 1980), the absence of a trespass would not necessarily lead to the opposite conclusion. "Legitimate expectations of privacy have sources outside property law, including understandings that are recognized and permitted by society." *Rakas v. Illinois, supra*, 439 U.S. at 143–44 n.12, 99 S.Ct. at 430–431 n.12. Common understandings of decency and civility may protect privacy against intrusions not prohibited by the law that has evolved for the protection of property. Several courts in the post–*Katz* era, although mentioning *Katz*, have appeared to rely on the absence of a trespass in holding that telescopic surveillance did not vio-

late Fourth Amendment rights. *See, e.g., United States v. Minton*, 488 F.2d 37 (4th Cir. 1973) *cert. denied*, 416 U.S. 936, 94 S.Ct. 1936, 40 L.Ed.2d 287 (1974); *Fullbright v. United States*, 392 F.2d 432 (10th Cir. 1968), *cert. denied*, 393 U.S. 830, 89 S.Ct. 97, 21 L.Ed.2d 101 (1969). To the extent that the results in these cases cannot be explained by the fact that the individuals observed exhibited no reasonable or justifiable expectation of privacy, we disagree with them.

10. We disagree with the intimation of the dissenting opinion in *People v. Arno, supra*, that the amount of Fourth Amendment recognition accorded to a person's privacy expectations may vary solely on the basis of whether his activity is criminal or innocent:

[I]t was incumbent on them to preserve their privacy from visual observation by merely drawing the drapes. Absent such an obvious and simple action I cannot find their expectation of privacy either justifiable or reasonable. The *law should not shield their criminal activity* from visual observation when they have shown such flippant disregard for their own privacy *while knowingly conducting their criminal activity.*

153 Cal.Rptr. at 635 (emphasis added). *See also* 1 La Fave, *supra*, at 258. While such a thrust has a certain amount of emotional appeal, we do not believe that analysis of the constitutional protection to be accorded to privacy expectations is significantly aided by reference to the nature of the conduct involved.

viewing into the interior of a home is that it risks observation not only of what the householder should realize might be seen by unenhanced viewing, but also of intimate details of a person's private life, which he legitimately expects will not be observed either by naked eye or enhanced vision. *See United States v. Agapito*, 620 F.2d 324, 330 (2d Cir. 1980), drawing a sharp distinction between permissible listening with the naked ear and impermissible enhanced listening with artificial devices.

■ In short, we reject both Taborda's suggestion that all activities conducted in his home were automatically entitled to Fourth Amendment protection, and the government's suggestion that every object or activity viewable through a telescope because Taborda failed to close the curtains was beyond Fourth Amendment protection. We conclude that observation of objects and activities inside a person's home by unenhanced vision from a location where the observer may properly be does not impair a legitimate expectation of privacy. However, any enhanced viewing of the interior of a home does impair a legitimate expectation of privacy and encounters the Fourth Amendment's warrant requirement, unless circumstances create a traditional exception to that requirement.

## III

■ In the present case, little could be seen inside Taborda's apartment from the street area around this building, and the affidavit supporting the request for a search warrant apparently did not rely on observations from the street. The observations were in fact made from an apartment across the street with a direct line of sight into Apartment 1G. If the 190–foot distance permitted normal unenhanced visual observations as the DEA agents testified, such observations were not searches within the meaning of the Fourth Amendment. To the extent, however, that the agents used the telescope to identify objects or activities that were not identified without an instrument, those observations were improper without a search warrant and could not form the basis for issuance of a warrant. The questions therefore, are what naked-eye observations were actually made, and were they sufficient in themselves to establish probable cause for the issuance of a warrant.

The Deignan affidavit, silent as to which observations were made by naked eye, stated that the surveillance had been conducted "at times" by means of a telescope. The use of the phrase "at times" would appear to imply that there were also observations without use of the telescope. Indeed it would not be wrong to infer from that phrase that *most* of the observations were made without the telescope. At the suppression hearing, the three DEA agents specified which objects and activities they were able to see without aid; their testimony indicated that all of the activities could be seen without the aid of the telescope, and that only details such as labels on jars and the number of small black objects could not be discerned unaided. The first task of the district court was to decide whether and to what extent to credit the testimony of the agents,[11] in order to make findings of

Preliminarily we note that, as a practical matter, analysis of constitutional protection in terms of the nature of the activity observed would give no useful guidance to law enforcement officials. To the extent that officers observed criminal conduct their surveillance would be lawful; but unless and until their surveillance bore such fruit, their observations would be unlawful. Such a standard of law enforcement conduct would be entirely unworkable.

On a more theoretical level, we view the reasonableness of an expectation of privacy as logically dependent principally, not on the degree of culpability of the activity, but on the

degree to which the locale is viewable by a member of the public without visual aids. A person in his home has no greater, nor more reasonable, expectation that he will be observed by his neighbor when his conduct is criminal than when it is innocent. What varies with the nature of the activity is not the likelihood, but rather the consequences, of its being observed. In other words, the nature of the activity does not alter the odds, but only the size of the wager.

11. There is no merit in Taborda's suggestion that the testimony of the agents should be excluded because their notes as to their surveil-

fact as to what objects and activities were observed by the naked eye.

The district judge, however, did not make clear assessments of credibility [12] and did not make any findings of fact. After the hearing he simply turned back to the affidavit and concluded, despite the implications of the phrase "at times" and the explications in the testimony, that all of the essential probative observations described in the affidavit "might" have been made through the telescope (491 F.Supp. at 51), and that he "must assume" that was so. (*Id.* at 53). The rationale for not making findings was that the district court could "look only to what was before the magistrate and not to what developed at the hearing." (*Id.* at 51.) In reaching this conclusion, the court failed to distinguish between the information before the magistrate and the means by which that information had been procured.

█ The Fourth Amendment requirement that probable cause be shown for a warrant to issue means, in essence, that the magistrate must be presented with information as to facts or circumstances sufficient to give him, as a reasonable person, grounds to believe that a crime is being or has been committed. Generally a court that is assessing whether probable cause was shown must look only to the information that was before the magistrate; a suppression hearing may not be used to bring out information on the basis of which the warrant could have issued, but which was not presented to the magistrate. *United States v. Menser*, 360 F.2d 199, 203 (2d Cir. 1966). But the task of the court here was not, in the first instance, to assess the probative value or sufficiency of the information presented. It was to determine what information that was presented to the magistrate should not have been presented. It is entirely appropriate for the court, on a proper showing by the defendant,[13] to hold a suppression hearing to determine which information that had been presented was in fact tainted. Thereafter the court must decide whether the untainted information that was presented to the magistrate, considered by itself, sufficed to establish probable cause.[14] If the untainted information alone established probable cause, the evidence seized pursuant to the warrant should not be suppressed:

When an affidavit in support of a search warrant contains information which is in part unlawfully obtained, the validity of a warrant and search depends on whether the untainted information, considered by itself, establishes probable cause for the warrant to issue.... If the lawfully obtained information amounts to probable cause and would have justified issuance of the warrant, apart from the tainted information, the evidence seized pursuant to the warrant is admitted.

---

lance were destroyed when they made their written reports. *See United States v. Sanchez*, —— F.2d ——, —— n.20, Nos. 79 1236, · 1237, –1246, –1271 (2d Cir. Sept. 9, 1980).

12. In colloquy on another question that arose during these proceedings the court referred to agent Bisbee as "a perfectly responsible witness."

13. Where a warrant has issued, the defendant has the burden of making a substantial preliminary showing that information in the supporting affidavit is tainted. Such a showing entitles him to a hearing, at which he has the burden of establishing by a preponderance of the evidence the fact of taint. *See Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978) (alleged perjurious statements in affidavit); 3 La Fave, *supra*, at 499. In the present case the Deignan affidavit itself raised questions as to how necessary

the telescope was to the observations that were recited; this justified holding a hearing since telescopic surveillance is neither per se lawful nor per se unlawful.

14. In assessing the probative value of the information presented, the underlying affidavit

must be tested and interpreted by magistrates and the courts in a commonsense and realistic fashion .... Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

*United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d. 684 (1965).

*James v. United States*, 418 F.2d 1150, 1151–52 (D.C. Cir. 1969) (footnote omitted); *United States v. Marchand*, 564 F.2d 983, 993 (2d Cir. 1977), *reh. denied*, 564 F.2d 1001 (2d Cir. 1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978).

Since no findings were made in the present case, we vacate the order of the district court suppressing the evidence seized pursuant to the search warrant, and remand to allow the district court to make findings as to what objects and activities in Apartment 1G, described in the affidavit, were observed by the naked eye from Apartment 3G, and to determine whether the information presented as to those objects and activities constituted probable cause for issuance of the search warrant.

Vacated and remanded for further proceedings consistent with this opinion.

DUMBAULD, Senior District Judge, dissenting:

In my judgment there can be no reasonable expectation of privacy with respect to what can be seen by means of a long-familiar and generally used optical instrument.

I would reverse *simpliciter*.