**Gene V. MARTIN Jr., Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–10592.

Court of Appeals of Alaska.

March 29, 2013.

---

14. Pruitt was diagnosed with depression and took medication for it for some time.

Gene V. Martin Jr., in propria persona, Seward, for the Appellant.

Timothy W. Terrell, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

*OPINION*

MANNHEIMER, Judge.

Gene V. Martin Jr. appeals his convictions for second-degree and fourth-degree controlled substance misconduct, based on his manufacturing of methamphetamine. The primary evidence against Martin was obtained during the execution of a search warrant at a residence that Martin was visiting at the time. This search warrant, in turn, was based in large measure on the testimony of a state trooper who walked up to the residence, looked through a narrow opening in the window blinds, and observed a number of supplies that are commonly used for making methamphetamine.

The question presented in this appeal is whether the state trooper acted lawfully when he approached the residence and peered through the window. As we explain more fully in this opinion, the evidence supports the trial court's findings that the trooper made his observations by looking through a window while standing on a walkway or deck that was open to the public, and that the methamphetamine supplies were in plain view through an opening in the window blinds. Based on these findings, the trooper's observations were lawful. We therefore uphold the search warrant for the residence, and we accordingly affirm Martin's convictions.

*Underlying facts*

On February 17, 2008, a loss prevention officer working at the Fred Meyer store in Wasilla contacted Trooper Mike Ingram. The loss prevention officer informed Trooper Ingram that a group of three individuals appeared to be interested in various items that are commonly used in the manufacture of methamphetamine.

Ingram arrived at the store while the individuals were still there, and the loss prevention officer identified some of those individuals to Ingram. Trooper Ingram then followed two of the people as they left the Fred Meyer store, joined two other people in a pickup truck, and drove to 405 North Old Glenn Highway, the site of a multi unit residence. There were five residential units at this address; because Trooper Ingram had to drive past the address to remain undetected, he did not see which of the five units the suspects entered.

Ingram requested the assistance of other law enforcement officers, and then he and the backup officers waited at the building (watching the suspects' car and apparently hoping that one or more of the four suspects would emerge). After waiting for approximately two hours, Ingram approached the structure, walked onto the deck or walkway adjacent to the building, and looked through the window of the first unit he came to.

This window had blinds, and the blinds were closed. But through a crack in the closed blinds (an opening created by a broken piece of blind), Ingram spotted various items used in making methamphetamine: several bottles of the fuel additive "HEET",

Pyrex glassware, a container of solvent, and tubing. Ingram also noticed a slight chemical odor.

After making these observations, Ingram returned to his patrol car and telephonically obtained a search warrant for this residential unit. During the execution of this warrant, Gene Martin and three companions were arrested inside the residence.

Martin and the others were indicted for second-degree misconduct involving a controlled substance (*i.e.*, manufacturing methamphetamine, and possessing precursor chemicals with the intent to manufacture methamphetamine), as well as fourth-degree misconduct involving a controlled substance (possession of methamphetamine).

Prior to trial, Martin asked the superior court to conduct an *in camera* review of the personnel file of every officer and other law enforcement employee who would be a witness in the case. The superior court denied this request.

Martin was ultimately tried for, and convicted of, the controlled substance offenses.

*The trooper's observation of the methamphetamine supplies*

Martin argues that Trooper Ingram violated our state's constitutional guarantee against unreasonable searches [1] when he approached the apartment and then peered through the closed blinds.

For purposes of our legal analysis, Ingram's actions had two components: first, the trooper's act of approaching the apartment to the point where he was standing outside the window; and second, the trooper's act of looking through the crack in the blinds.

■ The law allows a law enforcement officer to approach a residence without a warrant, and without an invitation, if the officer's path of approach is impliedly open to the public. As our supreme court explained in *Pistro v. State*, 590 P.2d 884 (Alaska 1979), the question is whether the officer "[is] standing upon a part of [the] property that has been expressly or impliedly opened to the public use":

> Thus, it [was] held that an officer who [left the] driveway [of a residence] and crosse[d] a portion of a yard which was not a normal access route to any door, so as to position himself next to a window in order to spy through a gap of about two inches at the bottom of a window shade, unlawfully intruded on the rights of privacy of the occupants.
>
> In contrast, a [court upheld a search involving] a police officer's observations through a screen door, ... [when the officer used] a normal means of access to the house leading up to a side door. Similarly, observations from a common passageway between apartments have been upheld. [And] officers walking through an unfenced driveway to inquire at premises have been held not to invade any reasonable expectation of privacy.

*Pistro*, 590 P.2d at 886–87 (internal citations omitted).

As this Court noted in *Michel v. State*, 961 P.2d 436, 437 (Alaska App.1998), "[t]he underlying premise of *Pistro* is that visitors—including unsolicited visitors—can be expected to use normal means to approach a residence."

■ In Martin's case, Trooper Ingram approached the apartment, and the window, by walking on a deck or walkway that ran along the building. The superior court found that this deck was impliedly open to the public:

> Ms. Foley [the tenant living in the apartment] may well be correct [in her testimony] that the people who live in the building treat the front deck as private property. But she testified that delivery people will walk along the deck if they go to the wrong door. More important, the [photographs] of the building demonstrate that a reasonable person walking up to the building would have no reason to believe that the deck [was the] private property [of the individual renters].... [T]he deck is not divided into separate areas; there are no signs ... indicating that any of the deck is private; all of the deck is readily accessible from the parking area for the building; and the deck leads around to the south side of the building[,] to a door which provides access to another apartment....

---

1. Article I, Section 14 of the Alaska Constitution.

A reasonable person, such as a delivery person or a repair person, would feel free to walk onto and along the deck to gain access to the appropriate apartment.

The record amply supports the superior court's underlying findings of fact, and we agree with the superior court's legal conclusion: under these facts, and under the rule announced by our supreme court in *Pistro*, Trooper Ingram acted lawfully when he approached the residential unit and walked up to the window.

The remaining question is whether Ingram acted lawfully when he looked through the window. As we have explained, the window had blinds, and the blinds were closed, but there was a gap in the blinds, apparently caused by a broken blind. Ingram (who was standing beside the window) looked through this gap to see if he could observe anything inside the apartment.

This issue is not as straightforward as the question of whether Ingram was entitled to approach the apartment by means of the deck or walkway.

The fact that the blinds were closed indicates that the people inside the apartment wished privacy, and it also suggests that these people had a subjective expectation of privacy. Moreover, based on our review of the record, it appears that the gap in the blinds was small enough that it would not have allowed people to look inside the apartment from a distance. This gap afforded a view into the apartment only when someone stood by the window.

We concede that many reasonable people might find it distasteful to have police officers approach residential windows and peer through gaps in the curtains or blinds. However, the case law on this point overwhelmingly favors the government. As long as the police officer is situated in a public vantage point, courts generally uphold a police officer's act of looking through small openings in walls or window coverings.

The law on this point is summarized in Wayne R. LaFave, *Search and Seizure* (5th edition, 2012), § 2.3(c), Vol. 1, pp. 749–767.

For specific cases, *see United States v. Fields*, 113 F.3d 313, 321–22 (2nd Cir.1997) (upholding police observations through a 5– or 6–inch gap in the window blinds); *United States v. Pace*, 955 F.2d 270, 275–76 (5th Cir.1992) (upholding police officers' observation of the interior of a barn when the officers, from a public vantage point, pressed their faces against the barn exterior to peer through a small hole); *United States v. Wright*, 449 F.2d 1355, 1356, 1362, 1366 (D.C.Cir.1971) (upholding observations made by a police officer who, with the aid of a flashlight, looked into a garage through an 8–inch opening in closed, locked garage doors); *People v. Berutko*, 71 Cal.2d 84, 77 Cal.Rptr. 217, 222, 453 P.2d 721, 726 (1969) (upholding observations made through an aperture in a window curtain). *People v. Superior Court*, 33 Cal.App.3d 475, 109 Cal.Rptr. 106, 109–110 (1973) (upholding observations made through cracks in a garage door); *People v. Galfund*, 267 Cal.App.2d 317, 72 Cal.Rptr. 917, 920–21 (1968) (upholding observations made by a police officer who obtained a neighbor's permission to enter the adjoining yard and, standing three feet away from the suspect's window, was able to view the interior of the room through a gap in closed blinds); *People v. Cortorreal*, 181 Misc.2d 314, 695 N.Y.S.2d 244, 246 (N.Y.App.1999) (upholding observations made by an officer who peered through the opening in a broken garage door from an adjoining alleyway); *State v. Buzzard*, 112 Ohio St.3d 451, 860 N.E.2d 1006, 1008–1010 (2007) (upholding observations made through a narrow crack between warped double garage doors); *Harkins v. State*, 782 S.W.2d 20, 23 (Tex.App. 1989) (upholding a police officer's observation of drug paraphernalia through a two-inch gap in the motel room curtains while the officer was standing on the sidewalk adjacent to the room); *State v. Bobic*, 140 Wash.2d 250, 996 P.2d 610, 616 (2000) (upholding observations made by a police officer who looked through a small hole in the wall separating two commercial storage units).

Contrast these holdings with the decision in *United States v. Kim*, 415 F.Supp. 1252, 1254, 1256–57 (D.Haw.1976), where FBI agents used an 800–millimeter telescope (*i.e.*, a telescope with a focal length of 31.5 inches) to observe activities inside the defendant's high-rise apartment from a quarter of a mile away. The federal district court rejected the government's argument that, because the de-

fendant left his curtains open, his activities were in plain view. *Id.* at 1256–57. The court held that even though the curtains of the high rise apartment were open, the defendant had a reasonable expectation of visual privacy because there were no other buildings close by that afforded a line of sight into his apartment, and because the defendant had a reasonable expectation that no one would be using a high-powered telescope to observe his activities from a quarter-mile away. *Ibid. Accord, United States v. Taborda,* 635 F.2d 131, 138 (2nd Cir.1980); *Wheeler v. State,* 659 S.W.2d 381, 389–90 (Tex. Crim.App.1982). *See also National Treasury Employees Union v. Von Raab,* 816 F.2d 170, 175 (5th Cir.1987) ("An individual . . . may open the curtains of his home to the view of unenhanced vision without consenting to the view of a telescope.").

■ To resolve Martin's case, we need not decide whether we would approve all the different types of police observation discussed in the foregoing cases—in particular, cases where police officers put their faces directly against a door, window, or wall and peered through tiny cracks or holes.[2] The facts of Martin's case are more favorable to the government than that.

According to Trooper Ingram's testimony, the crack in the blinds was large enough that he could readily see inside the residence while he was standing next to the window. During his testimony, Ingram was asked if he "[had] to bend over to look in [the window], or do anything of that nature", and he answered no:

> *Ingram:* I didn't [have to do anything like that]. I could see [inside the room] from the window itself. I walked up, and that's the first thing that caught my eye.

Ingram explained that it was after midnight, and that lights were on inside the room, allowing him to easily see into the residence.

Ingram was not engaged in some random fishing expedition. He reasonably suspected that the group of people he had followed to the residence had just brought drug manufacturing supplies into one of the units. Because Ingram was standing in a public vantage point (the deck or walkway directly adjacent to the apartment) when he looked through the window, his observation of the methamphetamine supplies inside the apartment was obtained lawfully.

(Because we conclude that the trooper's observation of the methamphetamine supplies was lawful, we need not resolve the State's claim that Martin lacked standing to challenge this evidence because he was not the renter of the apartment, but only a visitor).

*Martin's request for the superior court to conduct an in camera examination of the personnel files of every officer and law enforcement employee involved in the investigation*

Before his trial, Martin asked the superior court to conduct an *in camera* review of the personnel files of "all testifying officers"—by which he apparently meant every officer and law enforcement employee who would be called as a witness in his case.[3]

■ In support of this request, Martin relied on this Court's decision in *March v. State,* 859 P.2d 714 (Alaska App.1993), where we indicated that an *in camera* inspection of an officer's personnel file would be warranted if "the party seeking [disclosure] has a good faith basis for asserting that the materials in question may lead to the disclosure of favorable evidence". *Id.* at 718.

As his basis for seeking the *in camera* review of these personnel files, Martin asserted that Trooper Ingram had previously obtained search warrants by lying to magistrates, and he further asserted that Trooper Ingram and another trooper involved in his case, Trooper Young, had once planted evidence on an innocent person. (Martin made no specific accusations of misconduct against any of the other officers or law enforcement employees potentially covered by his motion.)

---

**2.** *See LaFave,* § 2.3(c), Vol. 1, pp. 766–67, suggesting that the limit of lawful surveillance is exceeded "when the [police engage in] keyhole-peeping, transom-peeping, or looking through minute openings in covered windows."

**3.** In his brief to this Court, Martin identifies these officers and employees as: Trooper Ingram, Trooper Gary Pacolt, Trooper Eric Spitzer, Trooper Kyle Young, Corrections Officer Jason Forester, DEA Agent Timothy Binkley, Wasilla Police Officer Joel Smith, and two forensic analysts employed by the State Crime Laboratory.

In its response, the State asserted that Martin had no good-faith basis for making these accusations. The State declared that Martin's charges were "complete fabrication", and the State challenged Martin to provide specific facts to support his accusations of misconduct.

Martin filed nothing else, and the superior court subsequently denied Martin's request "for the reasons set forth in the State's opposition".

On appeal, Martin contends that the superior court should have granted his request for *in camera* inspection of the various officers' personnel files. However, Martin no longer asserts that *in camera* inspection of these files was required under the rule announced in *March*. Instead, Martin argues that *in camera* inspection of these files was required *despite* the rule in *March*—because (according to Martin) the rule in *March* is unconstitutional.

Specifically, Martin contends that "[r]equiring [a defendant] to supply a 'good faith basis' [for disclosure] before [a trial] court conducts an *in camera* review [of personnel files] violates the accused's due process right to discovery of exculpatory information" under *Brady v. Maryland*.[4] Martin argues that the *March* rule is unconstitutional because it is unreasonable to require a defendant to provide a good-faith basis for seeking disclosure of personnel files when the defendant does not have access to those files and does not know their contents.

We interpret Martin's current argument as an implicit concession that he had no specific facts to support his accusations of misconduct, and that the superior court made the correct ruling under *March* when the court denied Martin's motion for *in camera* inspection of the personnel files.

The remaining question is the question that Martin raises for the first time on appeal: whether the rule announced in *March* violates the due process rights of criminal defendants.

The Ninth Circuit has ruled that the government has a duty to examine the personnel files of any law enforcement officers it intends to call as witnesses, to see if those files contain *Brady* material, and to disclose those portions of the personnel files to the defendant (or seek judicial *in camera* review of the files if the matter is uncertain). *Milke v. Ryan*, 711 F.3d 998, ——–——, 2013 WL 979127 (9th Cir.2013); *United States v. Henthorn*, 931 F.2d 29, 30–31 (9th Cir.1991); *United States v. Cadet*, 727 F.2d 1453, 1467–68 (9th Cir.1984). In particular, both *Milke* and *Henthorn* specifically reject the notion that it is the defendant's burden to make an initial showing of materiality. *Milke*, —— F.3d at ——; *Henthorn*, 931 F.2d at 31.

However, other federal circuits have rejected *Henthorn* and continue to require a defendant to make an initial showing that the requested files contain material information. *See United States v. Quinn*, 123 F.3d 1415 (11th Cir.1997); *United States v. Lafayette*, 983 F.2d 1102, 1106 (D.C.Cir.1993); *United States v. Driscoll*, 970 F.2d 1472, 1482 (6th Cir.1992); *United States v. Andrus*, 775 F.2d 825, 843 (7th Cir.1985). *See also State v. Robles*, 182 Ariz. 268, 895 P.2d 1031, 1035 (App.1995) (a state appellate decision rejecting *Henthorn* and continuing to require the defendant to make an initial showing).

Because Martin challenges the *March* rule for the first time on appeal, he must show that the superior court's adherence to *March* constituted plain error. But the fact that the federal circuits are split on this question means that Martin has failed to show plain error. As this Court has repeatedly stated, "[i]f a claim of error is reasonably debatable—if reasonable judges could differ on what the law requires—then a claim of plain error fails." *Simon v. State*, 121 P.3d 815, 820 (Alaska App.2005).

We therefore uphold the superior court's denial of Martin's discovery request.

*Conclusion*

The judgement of the superior court is AFFIRMED.

---

4. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).