**UNITED STATES of America, Plaintiff,**

**v.**

**Steve Lee WARD, Jimmie T. Sanders and Cheryl Lynn Rose, Defendants.**

**Crim. Nos. 82–30003–01, 82–30003–02 and 82–30003–03.**

United States District Court,
W. D. Arkansas,
Harrison Division.

Aug. 23, 1982.

**302**

J. Michael Fitzhugh, Asst. U. S. Atty., Fort Smith, Ark., for plaintiff.

Wm. R. Wilson, Jr., Wilson & Engstrom, Little Rock, Ark., for defendant Sanders.

Guy Jones, Jr., Conway, Ark., for defendants Ward and Rose.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

### Introduction

Defendants are charged with violations of 21 U.S.C. §§ 841(a)(1), 846, i.e., possession of a controlled substance with intent to distribute or dispense, and conspiracy to possess a controlled substance with such intent.

The action is presently before the Court on defendants' motion to suppress and for disclosure of confidential informant. On August 6, 1982, the Court conducted a hearing on the motions and took the matter under advisement. Because of the complexity of some of the issues and grave importance of the precise accurate resolution of factual matters, an in camera hearing was conducted on August 11 and 12, 1982. All of the parties have diligently presented and argued their respective positions. For the reasons set forth herein, the Court concludes that the evidence is admissible under the "exclusionary rule" established in Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), and the present-day interpretation of Fourth and Fifth Amendment doctrine.

### Factual Summary

On December 9, 1981, an undisclosed informant contacted F.B.I. Agent Jack Knox to discuss suspected criminal behavior by defendant Ward. The informant had never been an informant previously. Lieutenant Rife of the Arkansas State Police was also present.

Agent Knox testified at the suppression hearing that the informer related to him that approximately eight weeks earlier he had observed defendant Ward planting marijuana seeds in six to seven hundred clay pots in a barn located on the real property of defendant Sanders. The informer allegedly observed three rows of "grow" lights, or three "grow" lights in a row suspended over the pots which provided illumination essential to plant growth. The informant allegedly described the barn as "open," not mentioning any enclosures within the barn.

Agent Knox testified that the informant also observed several marijuana seeds in cellophane baggies. The informant allegedly related that he had in the past had drug dealings with defendant Ward.

Agent Knox testified that he then conferred with Lt. Rife and Investigators Beach and Combs of the Arkansas State Police. The informer allegedly related to Agent Knox that plants were located in a white barn with a tin roof which had black tar paper over the windows. Agent Knox directed Investigators Beach and Combs to conduct a surveillance of the barn from adjacent property. This property is located south of the barn at a distance of between 100 and 200 yards. Investigators Beach and Combs conducted nighttime surveillance with binoculars and infra-red telescopic "night scope" up to and including the early morning of December 12, 1981.

At approximately 12:30 a.m. on the morning of December 12, 1981, Investigators Beach and Combs observed an individual drive up to the barn, exit his vehicle, unlock the padlocked narrow door, and enter the barn. The individual could not be identified with the naked eye nor with binoculars, although with the use of the telescopic "night scope" Investigator Combs was able to identify defendant Ward as the individual.

Agent Knox testified that Investigators Beach and Combs related their observations to Lt. Rife, who told Agent Knox that Investigators Beach and Combs observed defendant Ward enter the barn and adjust something on the wall.

Based upon this observation and the information given Agent Knox by the informant, as well as defendant Ward's general history of drug dealing, Agent Knox allegedly related these facts to the affiant, Henry Tuck.

The affidavit of Mr. Tuck, however, recites that Investigators Beach and Combs saw defendant Ward "adjusting three rows of growing lights and/or black lights."

Investigator Beach, at the suppression hearing, specifically denied seeing defendant Ward adjust any lights and denied telling Lt. Rife or Agent Knox that he could see the lights at all. Similarly, Investigator Combs testified that he never saw defendant Ward adjust any lights and denied telling anyone that he did see it.

The proof submitted admits of no doubt that it is physically impossible to see the "growing" lights or the marijuana plants from the location of the surveillance. All windows were sealed and blocked and/or covered with tar paper. All entrances to the barn were nailed shut except the one small door through which defendant Ward entered. The lights and the plants were enclosed in a separate small room with its own door. The construction of the building is such that the two doors do not "line up" so that the door or interior of the small room can possibly be seen from outside the barn. Agent Knox, Investigators Beach and Combs and Lt. Rife all testified that it is indeed physically impossible to see the "growing" lights or the plants from their surveillance.

The undisputed proof shows that no lights at all on the interior of the barn can be seen from anywhere near the location of the surveillance.

The affidavit presented to the Magistrate states that three rows of the growing lights were seen and that defendant Ward adjusted them. Mr. Tuck testified at the suppression hearing that Agent Knox told him that these were seen. Agent Knox denies telling Mr. Tuck this.

Based upon the affidavit, a search warrant was issued and executed later that morning. Seven sets of double florescent lights and numerous small marijuana plants in plastic pots (rather than clay) were confiscated. Defendants were subsequently arrested and charged with violations of 21 U.S.C. §§ 841(a)(1), 846.

*Discussion*

Defendants first contend that the affidavit for search warrant was insufficient to show probable cause, and thus, all evidence seized under the warrant must be suppressed. Secondly, defendants assert that the evidence obtained during surveillance conducted with the use of the visual enhancement devices must be suppressed as fruits of a warrantless illegal search. Finally, defendants argue that the affidavit contains intentional or known false statements necessary to the finding of probable cause and therefore the results of the search must be suppressed. These arguments will be examined in turn.

I. *The Sufficiency of the Affidavit for Search Warrant*

Defendants' attack upon the search warrant is twofold: (A) that the affidavit presented to the Magistrate contained hearsay information furnished by an unidentified informant that does not meet the probable cause requirement of the Fourth Amendment under the test formulated by the Supreme Court in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723

(1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); and (B) the affidavit relies upon stale information that does not show the existence of probable cause at the time the warrant was issued.

A finding in support of either will justify the suppression of evidence obtained by the search.

### A.

■ The law is clear in this Circuit that in determining whether there was probable cause for the issuance of a search warrant, the reviewing court may consider only the information presented to the Magistrate. *United States v. Lyon*, 567 F.2d 777 (8th Cir. 1977); *Gillespie v. United States*, 368 F.2d 1 (8th Cir. 1966).

The facts presented to the Magistrate by way of affidavit contain the following statements:

On December 9, 1981, a resident of Searcy County, Arkansas, who admits dealing in drugs and who is fearful of his life and who has never been an informant, advised Special Agent Jack D. Knox, Federal Bureau of Investigation (FBI), that approximately eight weeks from the date of interview he saw Steve Ward, whom source described as a person with whom he has had past narcotics dealings, at a white barn with a tin roof located on property approximately three miles west on Zack Road from Highway 65 on the south side of the road in Searcy County. Ward was in the barn where there were 600 to 700 clay pots and a large quantity of marijuana seeds in a cellophane bag. Ward was observed planting the seeds in the dirt-filled pots, and suspended above them were growing lights and/or black lights in three rows. The windows of the barn had been covered with black tar paper.

Approximately four weeks previous to December 9, 1981, source advised SA Jack D. Knox, FBI, that he was again at the above-described property and saw the front door nailed closed, a padlock on the back door with windows secured.

Source also advised SA Jack D. Knox, FBI, that on December 4, 1981, at approximately 2:30 AM, he observed a small grey-colored sportscar with convertible top, which he knows to belong to Steve Ward, at the above-described barn. He observed this vehicle backed up to the back door of the above-described barn. At this time, the barn was still secured as described in the above paragraph.

On December 10, 1981, Sergeants Bill Beach and Rod Combs, Narcotics Investigators for the Arkansas State Police, at 12:30 AM, observed the white barn with tin roof located approximately three miles west from Highway 65 on the south side of Zack Road, property which Sgt. Combs knows to belong to Jimmy Terrell Sanders and which he used to raise hogs. Sergeants Beach and Combs observed from property adjacent to the above-described property, through the use of night scope and binolars [sic], a person they know to be Steve Ward adjusting three rows of growing lights and/or black lights. They advised that the barn windows were covered with black tar paper and the windows were secured. Sergeants Beach and Combs further advised that Steve Ward is known to them as being a dealer in narcotics.

Sergeants Beach and Combs advised it is their experience that persons involved in illegally growing marijuana plants will often use growing lights and/or black lights in a closed area so their activity cannot be observed by others.

On December 10, 1981, Major Quimby Johnson, Arkansas State Police, Little Rock, Arkansas, advised his records reveal that Steve Ward was arrested on January 23, 1978, at Clinton, Arkansas, for Burglary and Theft, no disposition shown. Ward was also arrested by the Sheriff's Office at Abilene, Kansas, for Larceny with no disposition shown. Major Johnson further advised they have received numerous reports of Steve Ward being involved in the sale and distribution of narcotics.

The law is plain that an affidavit is constitutionally insufficient to support a warrant if it merely states the affiant's conclusion on the ultimate fact in issue. *Aguilar, supra.* It must state both the factual observations from which that conclusion is inferred and the source from which the affiant learned of the factual observations. The averments must sufficiently disclose raw facts to permit the Magistrate to make an independent determination of their persuasiveness as tending to the conclusion that seizable items are presently in the place to be searched. *See Nathanson v. United States,* 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933); *Spinelli, supra.* A Magistrate may find probable cause on the basis of hearsay, if and only if (a) the information is factually specific rather than conclusory and discloses the circumstances of the informant's observations, *United States v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); *United States v. Janis,* 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), and (b) the affiant supplies the Magistrate with facts on the strength of which the declarant may be found to be reliable and credible. *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

The test adopted by the Eighth Circuit is declared in *United States v. Button,* 653 F.2d 319 (8th Cir. 1981), as follows:

> *Aguilar* was concerned with the ultimate trustworthiness of hearsay information. All hearsay was not to be rejected out of hand; neither was all hearsay to be uncritically accepted; some guidelines had to be devised to separate the wheat from the chaff. *Aguilar* sought first to ascertain the actual source of the incriminating information. The "basis of knowledge" prong was designed to locate that source and to examine the validity of his conclusion. It was not concerned with the integrity of the informant (that test would come later via the other prong) but only with his ratiocinative process-not with the honesty of his narration but with the nature of his perception: (How did he reash [sic] his conclusion? Did he see something or hear something firsthand or did he merely pass on a story or rumor from someone else? Or did he simply jump to a wrong conclusion on the basis of inadequate or ambiguous observations?) The simple thrust of the "basis of knowledge" prong was that the informant must not pass on his conclusion, let alone the conclusion of someone else, but must furnish the raw data of his senses, so that the reviewing judge could drawn [sic] his own conclusion from that data. Once having located the original source— the person who saw, heard or smelled something firsthand—then and only then did *Aguilar* look to the "veracity" of that source. As a substitute for the classic trustworthiness device of the oath, it sought some alternative guarantee that the declarant spoke truthfully. It sought "some of the underlying circumstances from which the officer concluded that his informant was 'credible,' or his information 'reliable'." The "veracity" prong, in precise terms, has two disjunctive spurs, seeking either a) the inherent "credibility" of the person himself or b) some other circumstances reasonably assuring the "reliability" of the information on the particular occasion of its being furnished."

*Id.* (quoting *Stanley v. State,* 19 Md.App. 507, 313 A.2d 847 (1974).

Defendants argue that "the subject affidavit contains absolutely no factual information by the affiant giving an opinion or reason to believe that the informant is credible or reliable."

In this regard, the affidavit recites that the informant (1) is a resident of Searcy County, Arkansas; (2) admitted past dealings in drugs; (3) was fearful of his life; and (4) had never been an informant in the past. (Affidavit, ¶ 1.)

The general rule is that information from an anonymous, unknown, or unfamiliar declarant alone is insufficient to constitute probable cause. *Contee v. United States,* 215 F.2d 324 (D.C.Cir.1954); *Lankford v. Gelston,* 364 F.2d 197 (4th Cir. 1966); *Costello v. United States,* 298 F.2d 99 (9th Cir. 1962). *See also Recznik v. City of Lorain,*

393 U.S. 166, 89 S.Ct. 342, 21 L.Ed.2d 317 (1968).

A greater showing of reliability of an informant's statement is required to support probable cause for a search than is needed to support the "reasonable suspicion" which is a prerequisite to a valid "stop" or "frisk." *United States v. Sierra-Hernandez*, 581 F.2d 760 (9th Cir. 1978).

Defendants contend that "[i]n this instance, there is no assertion of reliability or any other factual material about the informant upon which the magistrate could find compliance with the 'veracity' prong of *Aguilar*."

■ In cases where the affidavit does not contain sufficient information as to the reliability of the informant, other factors have been held to provide a substantial basis for crediting the hearsay.

If the undisclosed informant had given reliable information in the past, this is sufficient. *United States v. Hunley*, 567 F.2d 822 (8th Cir. 1977). This method is not applicable in the instant case as the informant was a first-time informant.

Another method is that the informant's reliability may be established by the fact that the tip includes a statement against the informant's penal interest. *United States v. Harris*, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). In this regard, Agent Knox testified that the informant made no "inculpatory" statements to him, other than the generalized statement that he had had some drug dealings with defendant Ward in the past. This nebulous assertion is not sufficiently specific to constitute a declaration against penal interest. Accordingly this method is not available here. *See Hunley*, 567 F.2d at 825, n. 3.

Under certain circumstances there may be "built-in" credibility of the informant when a victim's or innocent eyewitness' account provides the basis for a finding of reliability. *Cundiff v. United States*, 501 F.2d 188 (8th Cir. 1974); *Hunley, supra.* The undisputed testimony is that at no time was any person admitted to the hog barn without defendants' consent. The grow

lights and the marijuana could not be viewed from outside the barn. Thus, the informant must necessarily have been in the small separate enclosure within the barn in which the marijuana was found in order to view the contraband, or conducting his own clandestine trespassory surveillance. As defendants note, "The informant had to be either participating in the crime or looking over Steve Ward's shoulder."

In view of these circumstances, the informant's admitted past nefarious conduct, and the fact that he waited eight weeks to come forward, the informant can hardly be classified as a "victim" or wholly "innocent eyewitness" to the offense.

■ Yet another method of demonstrating the informant's credibility is that of independent corroboration. *Hunley, supra.*

The government argues that the affidavit contains corroboration in the following particulars: (1) the informant stated that the contraband was located in a white barn with a tin roof on the property of defendant Sanders. The affidavit recites that Investigators Beach and Combs observed a white barn with a tin roof on defendant Sanders' property; (2) the informant stated that he saw three rows of growing lights. The affidavit recites (albeit falsely) that Investigators Beach and Combs observed defendant Ward adjusting three rows of growing lights; (3) the informant stated that he had engaged in past drug deals with defendant Ward. The affidavit contains the assertion that defendant Ward has a prior arrest record (no convictions) for theft, and that "numerous reports of Steve Ward being involved in the sale and disposition of narcotics" had been received.

■ The latter corroborative element can be dismissed summarily. It is beyond question that the "known criminal" averment is not only insufficient to support a finding of probable cause, but "is entitled to no weight" whatsoever. *Spinelli*, 393 U.S. at 414, 418–19, 89 S.Ct. at 588, 590–591.

The former corroborative element, standing alone, is likewise insufficient. This is the I-shot-a-deer-by-a-tree-at-five-hundred-

yards-and-if-you-don't-believe-me-I'll-show-you-the-tree argument. The testimony showed that the barn is readily viewable from Zach Road, which is adjacent to the property of defendant Sanders, and any passerby could observe and describe the barn.

■ However, the second corroborative element, taken in conjunction with the first may well present a different situation. Although it is not obvious and beyond doubt that these elements establish a probability of criminal activity and concealment of contraband on specific premises on the date in question, *United States v. Taylor,* 599 F.2d 832 (8th Cir. 1977), it is well established that "[i]n doubtful or marginal cases, the resolution of the Fourth Amendment question should be determined to a large extent by the preference accorded to searches based upon warrants." *United States v. Leichtling,* 684 F.2d 553 (8th Cir. 1982). "Courts evince a strong preference for searches made pursuant to warrant, and, in some instances, may sustain them where warrantless searches based on a police officer's evaluation of probable cause might fail." *Leichtling, supra.* Further, the informant "was not an unidentified *professional* informant to whom stringent tests of credibility are applied." *United States v. Dennis,* 625 F.2d 782 (8th Cir. 1980).

Although the statements in the affidavit relating that Investigators Beach and Combs observed defendant Ward adjusting the grow lights are false, indeed impossible, we are unable to conclude that defendants have met their burden of proof that the affidavit for the warrant was *facially* deficient with regard to the hearsay and its reliability. The falsity of the statements will be discussed in Part III, *infra.*

### B.

As noted, defendants argue that the affidavit relies upon "stale" information that fails to demonstrate the existence of probable cause at the time of issuance of the warrant.

The affidavit recites that approximately eight weeks prior to the informant's inter-view of December 9, 1981, he observed defendant Ward planting the marijuana seeds in the barn.

Clearly, probable cause must exist at the time the warrant is issued. *United States v. Steeves,* 525 F.2d 33 (8th Cir. 1975). As stated in Dennis:

... If past circumstances would have justified the search, there must be reason to believe that those circumstances still exist at the time of the search. C. Wright & A. Miller, Federal Practice & Procedure § 662, p. 23. If, because of delay in applying for a warrant, the information in the affidavit is stale, probable cause may be diminished. *Andresen v. Maryland, supra,* 427 U.S. [463] at 478 n. 9, 96 S.Ct. [2737] at 2747 [49 L.Ed.2d 627]. But the delay is not considered separately. The length of the delay is considered together with the nature of the unlawful activity. *United States v. Johnson,* 461 F.2d 285, 287 (10th Cir. 1972). And they are considered in the light of common sense. *Id.* Hence, in *United States v. Johnson,* a three-week delay did not undermine probable cause where the illegal distilling was an on-going business, rather than a mere isolated violation. *Id.* In *Andresen v. Maryland,* a three-month delay did not undermine probable cause because the warrants were for business records that were likely to be maintained for a long time. *Supra,* 427 U.S. at 478 n. 9 [96 S.Ct. at 2747 n. 9].

In *Dennis* the continuing nature of the defendant's loansharking operation, as well as observations of collections only six days before the affidavit was offered, demonstrated that probable cause was not vitiated by the passage of three months since the last event described by the informant.

In *Button, supra,* the Eighth Circuit emphasized that the nature of the property sought and the nature of the activity are important considerations in determining whether probable cause is shown to exist on the date of the warrant:

Although there can be no precise rule as to how much time may intervene between

the obtaining of the facts and the issuance of the search warrant, in dealing with a substance like marijuana, which can be easily concealed and moved about, probable cause to believe that it was in a certain building on the third of the month is not probable cause to believe that it will be in the same building eight days later.

*Button, supra,* 653 F.2d at 325.

Defendants argue that:

Here, the only criminal activity observed in the Defendant's barn occurred over eight weeks prior to the issuance of the search warrant. Just because marijuana was observed in a structure eight weeks ago is clearly no evidence that it is still there. In a given case the presence of marijuana might be inferred from other facts, but the facts implying the presence of marijuana must clearly get stronger and more convincing with the passage of time. The facts of this case are not strong enough to overcome the staleness of the informant's information. There are insufficient facts to support a finding of probable cause existing at the time the warrant was issued. The search was therefore illegal under the Fourth Amendment and any evidence seized therefrom must be suppressed as evidence.

We agree that "[j]ust because marijuana was observed in a structure eight weeks ago is clearly no evidence that it is still there." This is more true when the contraband is placed in small containers easily capable of being moved from one location to another.

However, cultivating and propagating marijuana is an offense of a continuing nature. While this is not significant in itself, the described "set up" with grow lights, shelves, and growing paraphernalia, is a factor mitigating in favor of there being reason to believe that the circumstances still existed on December 12, 1982, the date of issuance of the warrant.

Although this, too, is far from conclusive, *Leichtling* requires that in marginal cases the validity of the search is governed to a large extent by the prefer-

ence given searches pursuant to warrant, and the existence of a warrant may, in some cases, sustain the search where a warrantless search based upon a police officer's evaluation might fail.

Therefore, we conclude that defendants have failed to meet their burden of proof in demonstrating the facial deficiency of the affidavit.

II. *The Visually Enhanced Surveillance*

Defendants argue that the use of artificial viewing devices which make visible certain conduct ordinarily obscured by distance and darkness constitutes a search for which a warrant is a prerequisite, citing, among others, *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

Traditionally, surveillance into premises without a physical trespass upon the premises was thought not to be a Fourth Amendment "search." Tom-peeping and eavesdropping were insulated from Fourth Amendment restriction by the doctrine that "the eye cannot commit a search," nor can the ear. The Supreme Court applied these concepts in the celebrated case of *Olmstead v. United States,* 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), to hold that telephone wiretapping was not a "search," and in *Goldman v. United States,* 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942), to hold that no "search" had been conducted by officers who monitored conversations in a suspect's room by means of an electronic sound-amplifying device placed against the party wall in an adjoining room. Finally, *Olmstead* and *Goldman* were expressly overruled in *Katz. Katz* held specifically that the monitoring of conversations through an electronic listening and recording device attached to the outside of a public telephone booth was a Fourth Amendment search; and it said more generally that "electronically listening to and recording . . . words [spoken in an area of] . . . privacy upon which [a person] . . . justifiably relied" would constitute a search without regard to "the presence or absence of a physical intrusion into any given enclosure." 389 U.S. at 353, 88 S.Ct. at 512.

The affidavit states that Investigators Beach and Combs, during nighttime surveillance through the use of a night scope and binoculars, observed defendant Ward adjusting the grow lights.

Investigator Beach testified that defendant Ward could not be identified without the night scope. With the binoculars darkness obscured the details. Investigator Combs testified that the night scope is telescopic and enhances available light so that it appears as dim daylight as well as magnifies the visual image.

■ We think it well-settled that the protection recognized by *Katz* includes protection against *unreasonable visual* intrusions as well as *auditory* intrusions. *United States v. Capps*, 435 F.2d 637, 641 n. 7 (9th Cir. 1970). Not all surveillances with visual aids, however, constitute invasions of privacy. *See United States v. Loundmannz*, 472 F.2d 1376 (D.C.Cir.1972) (activities on the street); *United States v. Grimes*, 426 F.2d 706 (5th Cir. 1970) (placing contraband in a car); *United States v. Minton*, 488 F.2d 37 (4th Cir. 1973) (activities outside a warehouse).

Several cases have considered and upheld the use of visual aids to detect activities in private premises. Two pre-*Katz* cases of the Supreme Court contain dicta that seemingly authorize observations with visual aids. *See United States v. Lee*, 274 U.S. 559, 563, 47 S.Ct. 746, 748, 71 L.Ed. 1202 (1927); *On Lee v. United States*, 343 U.S. 747, 754, 72 S.Ct. 967, 972, 96 L.Ed. 1270 (1952).

In *Fullbright v. United States*, 392 F.2d 432 (10th Cir. 1969), the Tenth Circuit upheld the introduction of evidence which government agents had gathered by looking into defendant's shed with binoculars. The court said that "observations from outside the curtilage of activities within are not generally interdicted by the Constitution." *Id.* at 434. *See also Commonwealth v. Hernley*, 216 Pa.Super. 177, 263 A.2d 904 (1970).

Some other courts have reached the opposite conclusion. In *United States v. Kim*, 415 F.Supp. 1252 (D.Haw.1976), the court stated:

> This court respectfully declines to follow *Fullbright* and *Hernley*. After *Katz*, the concept of curtilage and the presence or absence of a physical intrusion can have 'no constitutional significance' in determining whether or not a search has taken place. (Citations omitted) It is of the utmost significance, however, and this court so finds, that the sophisticated visual aids available to the government can intrude on individual privacy as severely as the electronic surveillance in *Katz* or the wiretapping in *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967).

In *United States v. Christensen*, 524 F.Supp. 344 (N.D.Ill.1981), the court upheld the use of binocular observation into a private home, but implied that infra-red viewing, such as that present here, is impermissible: "These binoculars do not rely on laser beams or infra red light to detect images not otherwise visible. Rather, they merely magnify what would in any event be apparent to the naked eye." *Id.* at 347.

In *United States v. Taborda*, 635 F.2d 131 (2nd Cir. 1980), the Second Circuit declared:

> We conclude that observation of objects and activities inside a person's home by unenhanced vision from a location where the observer may properly be does not impair a legitimate expectation of privacy. However, any enhanced viewing of the interior of a home does impair a legitimate expectation of privacy and encounters the Fourth Amendment's warrant requirement, unless circumstances create a traditional exception to that requirement.

*Id.* at 139.

The court in *United States v. Devorce*, 526 F.Supp. 191 (D.Conn.1981), interpreted *Taborda* as forbidding vision-enhancing devices only in the context of observing activities within the home:

> Nothing in *Taborda* indicates that this circuit requires a warrant in all instances where vision enhancing devices are utilized. On the contrary, *Taborda* requires

a case-by-case determination of the nature of the intrusion and the expectation of the privacy interest involved.

*Id.* at 201.

Darkness *per se* has never been regarded as an impenetrable barrier which, alone, demonstrates a legitimate zone of privacy. *United States v. Pugh,* 566 F.2d 626 (8th Cir. 1977); *United States v. Arredondo-Hernandez,* 574 F.2d 1312 (5th Cir. 1978). Accordingly, we decline to follow *Kim,* insofar as it may be interpreted to require a search warrant prior to any visually enhanced surveillance of persons on private premises. However, we also decline to follow *Fullbright* insofar as it may be construed as allowing visually enhanced surveillance in all cases. We are unaware of any Supreme Court decisions directly addressing the issue in light of *Katz.* Likewise, we have not been made aware of any Eighth Circuit decision specifically in point.

The more realistic approach, and the one more consistent with the rationale of *Katz,* is a case-by-case approach focusing on the two-tiered "zone of privacy" approach declared by Justice Harlan in his concurring opinion. This two-fold test has been approved by the Eighth Circuit in *United States v. Bruneau,* 594 F.2d 1190 (8th Cir. 1979):

> As stated by Justice Harlan in his concurring opinion, there is a two-fold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable".

*Bruneau,* at 1197.

A majority of the Supreme Court shortly thereafter adopted this approach. *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979).

█ In the context of visually enhanced surveillance several factors should be considered: (1) The type of visual aid employed; (2) The suspect's own privacy-enhancing conduct; (3) The nature and location of the area or enclosure under surveillance; (4) The number of persons with legitimate access; (5) The social inhibitions associated with the place observed; (6) The extent of the suspect's control of the closure; (7) The manner in which the view was obtained.

█ In the instant case a telescopic nightscope was employed. The barn was sealed from view and kept locked at all times when defendants Ward and Sanders were absent. Only defendants Ward and Sanders had a key.

On the other hand, the barn was located over 150 feet from the residence. Defendants were rarely in the barn. The barn was not equipped with the usual contents earmarking a dwelling necessitating privacy. Few social inhibitions attach to a barn or building of this nature. More importantly, defendant Ward was identifiably observed through the nightscope *outside* of the barn. Once inside the barn, defendant Ward was observed through binoculars allegedly illuminated by the existing lights in the barn. Defendant Ward left the door open with the lights on when he adjusted "something."

In any event, only the identity of the person at the barn was obtained by use of visual aids, as it was physically impossible to view the grow lights or the plants. This identification was obtained before defendant Ward entered the barn. The officers did not "peep" or peer into or through any windows or skylights. Neither did they obtain a view of objects or persons normally physically obscured. Nor did the officers obtain their view from unusual angles or heights.

Considering the above in the absence of controlling authority to the contrary, this Court concludes that any reasonable expectation of privacy possessed by defendants under the circumstances was not sufficiently invaded nor intruded upon to require the obtaining of a warrant prior to surveillance. *See Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Accordingly, under the facts presented in this particular case, we respectfully decline to suppress the fruits of the surveillance.

III. *Whether the Affidavit Contains Known or Intentional False Statements Necessary to the Finding of Probable Cause*

Based upon the testimony elicited during the suppression hearing, this Court has no hesitancy in finding that the affidavit for search warrant contained a false statement, i.e., that defendant Ward was observed adjusting three rows of grow lights inside the barn by investigators Beach and Combs. We now know that this is physically impossible. Further, for the reasons stated in Part I of this opinion, the Court concludes that the false statement was necessary to the finding of probable cause both as corroborative of the informer and substantively.

Thus, the issues specifically and squarely presented are (A) whether the false statement was made intentionally or in reckless disregard of the truth, *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), and (B) whether the defendants may force the unnamed informant's identity to be disclosed.

A.

In *Franks,* supra, the Supreme Court held that where the defendant demonstrates by a preponderance of the evidence that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the warrant affidavit, and if the false statement is necessary to the finding of probable cause, the Fourth Amendment requires that the search warrant be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit. *Id.* at 156, 98 S.Ct. at 2676. The Supreme Court expressly recognized that the "police could not insulate one officer's deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity." *Id.* at 163, n. 6, 98 S.Ct. at 2680, n. 6.

Thus, if any person in the information chain knowingly or recklessly makes false statements which are included in the affidavit, the warrant must be quashed if the statements are necessary to the finding of probable cause. See also *Rugendorf v. United States,* 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964).

The testimony shows that the affiant, Mr. Henry Tuck, included the statement that defendant Ward was observed adjusting three rows of lights in the barn by Investigators Beach and Combs. He testified that Agent Knox told him this.

Agent Knox, on the other hand, testified that he did not relate this to Mr. Tuck, and that neither Lt. Rife, nor Investigators Beach and Combs told him this. Lt. Rife testified that he did not tell this statement to Agent Knox and that neither Investigators Beach nor Combs told him this. Investigators Beach and Combs testified that they did not see defendant Ward adjust any lights and never related that they did see this to anyone.

Thus, either Mr. Tuck, the affiant, or Agent Knox originated the false statement. Both testified that they passed on whatever information they received accurately and in good faith.

Defendants assert that it stretches credibility to conclude that it is a mere coincidence that the informant mentioned three rows of grow lights and then inadvertently and out of nowhere the false statement appears in the affidavit that Investigators Beach and Combs also saw this in corroboration. This gives the Court a great deal of concern as well.

On the other hand, it is possible that somewhere along the chain of information one of the parties confused what the informant had related with what Investigators Beach and Combs actually observed. However, in view of the relative credibility of the witnesses, very carefully scrutinized by the Court, the Court is not convinced that the failure of the police to double-check the information by pulling together five or six persons into a huddled conference between 12:30 a. m. and 6:00 a. m. constitutes a deliberate or reckless disregard of the truth.

Obviously the procedures employed could have been executed in a better manner, and

this type of activity is not to be encouraged lest warrants issue routinely based upon inaccurate and false statements, resulting in searches of persons and places without due regard for the constitutional requirement of probable cause.

We are troubled that in the instant case a warrant was issued, in part at least, based upon false sworn statements presented to the Magistrate. But the burden is defendants' to show *deliberate* falsehood or its equivalent, rather than inadvertence or negligence. Accordingly, we must decline to quash the warrant on this ground.

### B.

Defendants' final argument is that the identity of the undisclosed informant must be revealed. Defendants *do not dispute the* existence of the informant, but do dispute the accuracy of the informant's statements and whether these statements were ever made to Agent Knox.

In *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), the Supreme Court declared:

A further limitation on the applicability of the privilege (of non-disclosure) arises from the fundamental requirements of fairness. Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way. In these situations the trial Court may require disclosure and, if the Government withholds the information, dismiss the action.

*Id.* at 60–61, 77 S.Ct. at 627–628.

The Supreme Court continued:

Most of the federal cases involving this limitation on the scope of the informer's privilege have arisen where the legality of a search without a warrant is in issue and the communications of an informer are claimed to establish probable cause. In these cases the Government has been required to disclose the identity of the informant unless there was sufficient evidence apart from his confidential communication.

In *Portomene v. United States,* 221 F.2d 582 (5th Cir. 1955), the accused was charged with two sales of drugs to an informer. The accused testified that he never sold narcotics and that the person he believed to be the informer had a grudge against him. The Fifth Circuit required disclosure.

The Seventh Circuit, when first addressing the issue in *United States v. Conforti,* 200 F.2d 365 (7th Cir. 1952), confronted a situation where the accused was charged with possession of counterfeit notes. Agents overheard the informer make arrangements with the accused, witnessed their meeting and a transferral of a package, and then received the package of notes from the informer. The Court held that the accused would have been entitled to disclosure had a proper demand been made.

Considering the rationale of these cases, the Supreme Court in *Roviaro* said:

So far as petitioner knew, he and (the informer) were alone and unobserved during the crucial occurrence for which he was indicted. Unless petitioner waived his constitutional right not to take the stand in his own defense, (the informer) was his one material witness

In *United States v. Roberts,* 388 F.2d 646 (2nd Cir. 1968) the informant was a witness to the alleged sale of narcotics. The Court held that the Government should have been required to disclose the informant's whereabouts, so that the defendant could interview the informant prior to trial as a potential witness.

Reviewing these and many other cases, the Eighth Circuit declared in *United States v. Barnes,* 486 F.2d 776 (8th Cir. 1973):

We think it clear from the causes decided since *Roviaro* that where the witness is an active participant or witness to the offense charged, disclosure will almost always be material to the accused's defense.

The Eighth Circuit remanded the cause:

In the event the informant possesses evidence which in any way impeaches the

credibility of the Government's case or would have been helpful as a defense to the charge, the trial court should view the same, in light of the testimony existing, to determine if any prejudice arose. Upon such hearing and finding the cause shall be certified with the complete record to this Court.

More recently, in *Bruneau,* supra, the Eighth Circuit said:

When a government informant is an active participant in, or witness to, the offense charged, his identity must generally be disclosed upon a defendant's motion. When, however, the government informant is a mere tipster who conveys information to the government but neither witnesses nor participates in the offense, disclosure cannot be mandated. (Citing *Roviaro,* supra., and *Barnes,* supra.)

 Defendants assert that the informant never witnessed defendant Ward in the room in the barn in which the marijuana was located. Defendants presented some evidence that they believe the informer fabricated this story for reasons of his own and if located, would admit that he deliberately lied to Agent Knox or never made the disclosure at all.

Thus, defendants contend, the presence of the informer is necessary to show that there was a deliberately false material statement in the affidavit which, if excluded, vitiates probable cause.

If the informer would materially contradict Agent Knox, defendants would be entitled to his production because it would call into question the credibility of a material government witness before the jury.

It is for this reason that the Court conducted an *in camera* hearing on August 11 and 12, 1982, of Agent Knox and the informer, with a view toward balancing the respective rights of the defendant to a fair trial as required by due process and the interests of the government in nondisclosure.

The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

*Roviaro,* supra, 353 U.S. at 62, 77 S.Ct. at 628.

The *in camera* hearing discloses that the informer made no false statements to Agent Knox. We are convinced that the informer saw what he said he saw. We are convinced that the affidavit for search warrant accurately reflected what the informer related to Agent Knox. The hearing disclosed that, if called to testify, the informer would relate the same story of which defendants are already aware. Agent Knox's notes, containing the contents of the informer's communications, have been reviewed and preserved, and nothing contained therein could remotely be of any benefit to defendants or the Court.

We can perceive of no defense even arguably present to which the informer's testimony would be helpful to the defendants, if even relevant. There is no remotely exculpatory effect possibly resulting from the informer's testimony. At least as to defendant Ward, anything the informer could say would be cumulatively incriminating, and nothing the informer could say would bear on the credibility of any government witness. Further, the defendants are, of course, at liberty to subpoenae any persons they believe to have relevant testimony, including the informer. We are convinced that the concern of the government for the safety of the informer is real and immediate. In view of the lack of any benefit that the defendants would or could possibly gain from disclosure balanced against the grave and serious threat to the informer and his family and the free flow of information, we conclude that neither the search issue nor the guilt issue require disclosure in this case. We hold only that the informer's identity need not be revealed. Should his identity become known to defendants in

other ways, they are free to pursue whatever legal course they choose. See *Bruneau, supra*, at 1197–98.

### CONCLUSION

In light of the above, this Court concludes that the seized evidence is admissible, that the surveillance was lawful, and that the identity of the governmental informer need not be disclosed.

Accordingly, defendants' motion to suppress will be denied.