### UNITED STATES of America

v.

### Edward D. CHRISTENSEN and William J. Clesen.

### No. 80 CR 407–2.

United States District Court, N. D. Illinois, E. D.

June 8, 1981.

John Sullivan, Asst. U. S. Atty., Chicago, Ill., for plaintiff.

Thomas D. Decker, Chicago, Ill., for Clesen.

## MEMORANDUM OPINION AND ORDER

DECKER, District Judge.

Defendant William Clesen has been charged in four counts of a seven-count indictment with having printed and transferred counterfeit federal currency and with knowing possession of plates designed for printing such currency. Clesen's arrest and seizure of much of the crucial evidence against him resulted at least in part from binocular assisted observation of Clesen's activities inside a private place of business. Clesen has moved to suppress all of the evidence that can be linked to these observations on the grounds that visual intrusion into a private place of business through the use of binoculars and without the authority of a search warrant is a violation of the Fourth Amendment. On April 27, 1981, this court denied Clesen's motion to suppress, holding on the authority of *U. S. v. Allen*, 633 F.2d 1282, 1288–1289, 1291–1292 (9th Cir. 1980), that the surveillance in this case did not infringe Clesen's Fourth Amendment rights. Clesen has moved to reconsider that decision.[1] The government, not surprisingly, has opposed this motion, arguing that the court's initial decision was correct, and that, even if it were not, the arrest and most of the disputed evidence in this case were not tainted by the binocular assisted observations. On mature reflection, the court remains convinced that the motion to suppress must be denied.

### 1. *The Facts.*

The events leading to Clesen's arrest and to discovery of the challenged evidence are fully described in the affidavits submitted in connection with this motion. Insofar as they are relied on below, none of the affidavits' contents are disputed.

The investigation that led to Clesen's indictment began when another defendant in this case, Edward Christensen, sold a small amount of counterfeit money to a government informant in early May of 1980. Beginning on May 23, on the basis of this initial sale, regular contact was made with Christensen by Secret Service agent Alex Falcon acting undercover. Falcon and Christensen entered into negotiations concerning a substantial sale of counterfeit bills, and it was these negotiations that eventually led the government to Clesen.

Initially, the government became aware of Clesen's existence as a result of a variety of circumstantial evidence. Thus, at one point Christensen told Falcon that he would shortly be meeting with the person who would supply the counterfeit money. Christensen promptly met with Clesen. Similarly, there was a time when Falcon was told that Christensen was going to immediately telephone his supplier. A pen register attached to Christensen's telephone indicated an immediately subsequent call to Clesen's phone number. On July 19 Falcon was informed by Christensen that the counterfeit would be printed on July 21 or 22. Consequently, Secret Service agents began periodic surveillance of Clesen's activities.

On the evening of July 22 agents observed Clesen's car parked in front of a building belonging to a company called Presstige Printing. Presstige Printing is owned by Thomas Stanley. Clesen had been observed meeting with Stanley at Presstige on June 24 and again, this time in a parking lot, on June 25. Consequently, subsequent to the discovery of Clesen's car, the Presstige building was placed under surveillance. Using binoculars, the agents were able to peer through an open window into a lighted room in which Clesen and Stanley were working. The agents were

---

1. Though this motion to reconsider has been joined in by another defendant in this case, Edward Christensen, the court today considers the motion only insofar as it applies to the case against Clesen.

able to discern that Clesen and Stanley were printing and cutting what appeared to be federal reserve notes. This printed material was loaded into some boxes which, somewhat after midnight, were in turn loaded into Clesen's car. Clesen, followed by Secret Service agents, then drove to a nearby restaurant where he was observed to meet Christensen. After coming out of the restaurant, Clesen opened his car and handed the boxes to Christensen. As Christensen turned away to walk to his own car, the two were approached by the Secret Service agents and arrested. During the course of these events, one of the boxes fell to the ground and its contents spilled out. The contents of the box resembled federal reserve notes. Both boxes were seized. They later proved to contain $171,000 in counterfeit money. Shortly after the arrests, search warrants were obtained for Clesen's car and Presstige Printing. Both searches produced incriminating evidence, including the plates used to print the counterfeit.

In support of his motion for reconsideration Clesen has submitted an affidavit which admits that he printed the counterfeit on a press that was directly opposite an uncurtained window and that this window faced directly onto a public street. The affidavit also admits that the printing took place at night and that the room was lighted. Finally, the affidavit and a diagram attached to it indicate that it would be possible to observe the lighted window from a distance of somewhat over 200 feet without being observed from within the Presstige building. Thus, the affidavit essentially admits that it would be possible to discern the existence of some activity in the Presstige building even without the aid of binoculars. At the same time, the affidavit asserts, and this is not disputed, that it would be impossible to discern any detail as to activity in the Presstige building with the naked eye while avoiding observation from within the Presstige building. In short, it is undisputed that, without the use of binoculars, the agents could not have been sure that Clesen was the one who was using the Presstige press or that he was using it to

print something resembling federal reserve notes. The merit of this motion turns on the propriety of these binocular assisted observations and on their significance in the sequence of events that led to Clesen's arrest.

### 2. The Binocular Assisted Surveillance.

■ There is no dispute in this case but that surveillance of the Presstige building was effected without a search warrant, and none that, if that surveillance amounted to a constitutional "search," it was improper. The question, thus, is whether or not a binocular assisted surveillance of a private place of business, under the aforementioned circumstances, is a search within the meaning of the Fourth Amendment. The starting point in analyzing this question is the decision of the United States Supreme Court in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

Prior to *Katz* it had, at least arguably, been the rule that common law concepts of trespass controlled the question of whether or not a search had taken place. *E. g., Olmstead v. U. S.*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928). Thus, under these earlier cases, the threshold issues in Fourth Amendment analysis were essentially questions of the law of property and tort. In *Katz*, however, the Court gave Fourth Amendment analysis a very different foundation:

"The Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. [Citations omitted.] But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. [Citations omitted.]" 389 U.S. 351–352, 88 S.Ct. at 511.

This emphasis on the expectation of privacy, though clearly tinged with subjective elements, was patently not meant to ground Fourth Amendment protections on the individual's mere desire for secrecy. Thus, as the government correctly points out, the fact that Clesen chose to print counterfeit

late at night in a location where unaided observation of his activities was unlikely and where such observation could readily be detected is not, by itself, sufficient to trigger the Fourth Amendment's protections. *See, e. g., Rakas v. Illinois,* 439 U.S. 128, 143 n. 12, 99 S.Ct. 421, 430 n.12, 58 L.Ed.2d 387 (1978). Rather, as Justice Harlan's often quoted concurrence makes clear, the *Katz* rule has a distinctly objective element:

> "My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first, that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable'. Thus, a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the 'plain view' of outsiders are not 'protected' because no intention to keep them to himself has been exhibited. On the other hand, conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable." 389 U.S. at 361, 88 S.Ct. at 516.

Here, it is not disputed that Clesen was engaged in illegal activity in a lighted room directly in front of an unobstructed window that faced on a public thoroughfare. Consequently, his conduct would have been fully visible to any person who chanced to walk by. As an affidavit submitted in connection with Clesen's motion establishes, such passersby, while infrequent, are not unheard of in that location and at that time of night. In any event, there is no dispute that the area commanding a view into Presstige Printing is accessible to the public and that no Fourth Amendment question would have arisen had the Secret Service agents made their observations without the aid of binoculars. The court is frankly baffled as to what "privacy" interests the agents infringed by observing what defendant had already "knowingly expose[d] to the public" in this manner.

■ While defendant has sought to implicate such interests by raising the spectre of an omniscient government spying on its citizens through the assistance of a vast and arcane array of sense enhancing devices, all that is actually involved here is a pair of binoculars. These binoculars do not rely on laser beams or infra red light to detect images not otherwise visible. Rather, they merely magnify what would in any event be apparent to the naked eye. Admittedly, the use of binoculars gave the agents a better view of Clesen's and Stanley's printing activities than they might otherwise have had. But the only reason it was possible to have any view of those activities at all was because they were already on display. As the Ninth Circuit has recently held, "The use of aids to the senses such as binoculars does not convert unobjectionable surveillance into a prohibited search." *U. S. v. Allen,* 633 F.2d 1282, 1290–1291 (9th Cir. 1980). *See also, U. S. v. Bifield,* 498 F.Supp. 497, 506–508 (D.Conn.1980).

Defendant objects to this conclusion on a number of grounds, but the long and the short of his argument is that he disagrees with this court's application of the principles of *Katz* to this case. While defendant's position is not without support in the precedents, *see U. S. v. Taborda,* 635 F.2d 131 (2d Cir. 1980); *U. S. v. Kim,* 415 F.Supp. 1252 (D.Haw.1976), this court, for the reasons stated above, is unpersuaded. Accordingly, the court holds that the binocular assisted surveillance of Clesen's activities inside of Presstige Printing did not violate his Fourth Amendment rights.[2] This conclu-

---

**2.** In the court's initial opinion denying the motion to suppress, it was held that, even if the binocular aided surveillance represented an intrusion on Clesen's Fourth Amendment rights, the limited nature of the intrusion coupled with the agents' reasonable suspicion that a crime was in progress, justified the conduct. The court so held on the basis of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Terry* has been cited by the Supreme Court as establishing that seizures of a person which represent minimal intrusions on Fourth Amendment rights are permissible where grounded by a reasonable belief that the individual seized is involved in criminal conduct. *See* concurring and dissenting opinions in *U. S.*

sion, standing alone, would suffice to justify denial of the motion to reconsider. There is, however, a second independent basis for this decision; for, even if the binocular aided observations were improper, those observations could not be held to taint Clesen's eventual arrest or the seizure of most of the incriminating evidence in this case.

### 3. Taint of the Surveillance.

█ Even without the benefit of the observations made through the binoculars, the Secret Service agents had extensive evidence implicating Clesen in a counterfeiting scheme. Thus, prior to the surveillance of Presstige Printing, the agents had strong circumstantial evidence indicating that Clesen was going to print the counterfeit bills that Secret Service Agent Falcon was going to purchase from Christensen; they knew that Christensen expected the bills to be printed on the night of July 21 or July 22; and they knew that, on the night of July 22, Clesen's car was parked outside of a print shop owned by a man whom Clesen had visited with on several previous occasions. During and after their surveillance of Presstige Printing they learned several other important pieces of information without the assistance of binoculars. Thus, they learned that somebody was at work inside of Presstige Printing between the hours of 9:00 P.M. of July 22 and 12:30 A.M. of July 23; they learned that at 12:40 A.M. of July 23, Clesen emerged from Presstige Printing holding two cardboard boxes; they learned that he put those boxes in the trunk of his car and drove to a nearby restaurant where he met Christensen; and finally, they learned that, after eating, Clesen emerged from the restaurant and handed the boxes to Christensen. It was, of course, at this point that Clesen and Christensen were arrested. Thus, excluding the evidence obtained by use of the binoculars, the agents arresting Clesen had good reason to believe Clesen was the supplier in a counterfeit scheme; that he had spent the better part of a night in a printshop where somebody was at work; and that he had delivered two boxes taken from the printshop to Christensen, a man who had been expecting to receive a large delivery of counterfeit. This was manifestly probable cause sufficient to justify the arrest and the subsequent searches and seizures.

█ It is well established in this and other Circuits that evidence is not tainted even though it is obtained in part by unlawful means so long as an independent and lawful ground existed that would inevitably have led to the evidence's discovery. *U. S. ex rel. Owens v. Twomey*, 508 F.2d 858, 865–866 (7th Cir. 1974); *U. S. v. Piet*, 498 F.2d 178, 181 (7th Cir.), *cert. denied*, 419 U.S. 1069, 95 S.Ct. 655, 42 L.Ed.2d 664 (1974); *U. S. v. Edwards*, 602 F.2d 458, 469 n. 12 (1st Cir. 1979); *U. S. v. Sor-Lokken*, 557 F.2d 755 (10th Cir.), *cert. denied*, 434 U.S. 894, 98 S.Ct. 274, 54 L.Ed.2d 181 (1977); *U. S. v. DeMarce*, 513 F.2d 755, 758 (8th Cir. 1975). *See also, Stevenson v. Mathews*, 529 F.2d 61 (7th Cir. 1976) (unlawful arrest does not necessarily invalidate subsequent proceedings). Here independent lawful grounds existed to justify Clesen's arrest and the seizure of the disputed evidence. Moreover, there can be little doubt that these independent grounds for the arrest and seizure would inevitably have led the agents to behave as they did. Accordingly, even if this court were to conclude that the use of binoculars to observe Clesen's activities was improper, none of the evidence in dispute would be tainted. Hence, even if this court agreed with defendant's Fourth Amendment analysis, the motion to suppress would have to be denied except insofar as it relates to evidence obtained directly through the use of the binoculars.

For all of the above reasons, defendant Clesen's motion to suppress is denied.

v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 1881, 1884, 64 L.Ed.2d 497 (1980). While this court sees no principled reason for declining to apply such reasoning in the context of a Fourth Amendment search, the court does realize that such an application of *Terry* would represent an extension of that decision. The ruling here is not based on that analysis.