UNITED STATES of America, Plaintiff-Appellee,

v.

Walker L. WHALEY, Defendant-Appellant.

No. 84–3459.

United States Court of Appeals, Eleventh Circuit.

Jan. 10, 1986.

Rehearing and Rehearing En Banc Denied Jan. 10, 1986.

---

Samuel S. Jacobson, Jacksonville, Fla., for defendant-appellee.

Ernst D. Mueller, Asst. U.S. Atty., Jacksonville, Fla., Karen Skrivseth, Washington, D.C., for plaintiff-appellee.

Before GODBOLD, Chief Judge, TJOFLAT, Circuit Judge, and SIMPSON, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

This appeal presents one issue: whether a warrant to search appellant's home was based on evidence obtained in violation of the fourth amendment. The district court concluded that it was not. We agree and affirm appellant's conviction.

I.

In the fall of 1981, the Drug Enforcement Administration (DEA) established a storefront operation in Atlanta, Georgia, called Georgia Laboratory Supply, to sell chemicals and laboratory equipment for the purpose of identifying clandestine drug manufacturing laboratories. During the course of this operation, DEA agents, acting undercover, received a series of long-distance telephone calls from Jonathan Whaley, appellant's brother, who used the

name "David Brown" to order laboratory supplies and chemicals that could be used in the manufacture of synthetic cocaine. Jonathan Whaley requested that these materials be delivered to an apartment house address in Jacksonville, Florida. In November 1982, as DEA agents were reviewing records of various chemical supply houses, they discovered that Jonathan Whaley, using the same address as "David Brown," had ordered additional laboratory equipment and chemicals used in the manufacture of synthetic cocaine from American Scientific Supply Company.

As a result of this discovery, the DEA assigned Agent Douglas Driver of its Jacksonville office to investigate. Using the apartment address Jonathan Whaley had given for delivery of the chemicals, Driver immediately began a surveillance and learned that the apartment was occupied by Jonathan Whaley and his girl friend, Diane Brown. In December 1982, Driver obtained the chemicals and laboratory equipment ordered by "Brown" from Georgia Laboratory Supply and arranged for a "controlled delivery" of the materials, which were packaged in boxes, by a local police detective dressed in a United Parcel Service uniform. Driver also consulted DEA chemists who told him that the chemicals ordered by Jonathan Whaley from Georgia Laboratory Supply and American Scientific Supply Company represented the essential ingredients for the manufacture of synthetic cocaine and that the chemicals were ordered in the appropriate ratio for such manufacture.[1]

Realizing that it was unlikely that a chemical laboratory could be set up in the Whaley/Brown apartment, Agent Driver continued his surveillance of the apartment. Four days after the controlled delivery, Jonathan Whaley loaded the boxes of chemicals into his car and took them to appellant's home. Several DEA agents followed the car and watched Jonathan Whaley carry the boxes into the basement of appellant's house. Agent Driver then set about finding a location from which the DEA could conduct a surveillance of the basement, where he suspected that a synthetic cocaine laboratory was being operated.

Appellant, a practicing obstetrician-gynecologist, lived in an affluent residential area. His residence was located on approximately three acres of land and was set back sixty to one hundred yards from the nearest public road. The property was bounded on the west side by the St. Johns River and on the north side by a small canal. Access to the canal from the river was blocked by a floating footbridge which was locked in place. The only persons who could unlock the footbridge and swing it out of the way were appellant and three other property owners who lived on the canal.

After a lengthy examination, Agent Driver concluded that the best view of appellant's basement would be from a location across the canal on neighboring property. Driver and other agents checked various possible locations on the neighboring land and eventually found that, by climbing down a steep wooded bank to the edge of the canal, they could obtain an unobstructed view of appellant's basement from a distance of about forty yards. From this surveillance spot they found that, if the basement lights were turned on, they could clearly monitor activity in the basement by looking through the windows. The basement door had tall windows in it, and there were large windows on each side of the door. Because none of these windows were curtained, when the basement lights were on the surveillance of the basement was described by one agent as "just like watching T.V."

After obtaining the permission of appellant's neighbor to enter the property, periodic surveillance of appellant's basement began in early January 1983. Originally,

---

**1.** The chemists noted that only two of the ingredients for the manufacture of cocaine, fuming sulfuric acid and benzoyl chloride, were not ordered. Sulfuric acid, however, was readily available in Jacksonville, Florida, and DEA agents later learned that appellant, a physician, had ordered this acid from his hospital pharmacy.

the surveillance was limited to occasional evening visits by a DEA agent who lived nearby. This agent observed no activity in the basement until February 10, 1983, when he noticed that the boxes of chemicals had been unpacked and that a laboratory had been set up. From that night until April 7, 1983, an agent would check the basement laboratory each night to see if the lights were on,[2] and, if they were, one or more agents and sometimes local police officers would observe the activity taking place. Although such activity could be seen with the naked eye, the agents frequently used binoculars to aid their observation.

At various times during the surveillance, Jonathan Whaley, Walker Whaley, and Diane Brown were seen in the laboratory. The two brothers were seen working with the chemicals and laboratory equipment on many occasions. DEA chemists were informed about the activities observed in appellant's basement, and these chemists told the agents that the activities were consistent, in part, with the various steps in the manufacture of cocaine.[3]

On April 6, 1983, Agent Driver obtained a search warrant for appellant's basement.[4] The search was executed the following night. In the laboratory, DEA agents seized notes and formulas for the synthesis of cocaine and all the chemicals and equipment necessary to complete the process. Residue in the laboratory equipment proved to be the products of two intermediate stages of the eight-stage process for synthesizing cocaine.

Appellant, his brother, and Diane Brown were indicted on May 12, 1983,[5] as a result of the activity we have described. The indictment contained thirteen counts; appellant was charged in counts one, ten, and eleven. Count one cited the defendants for conspiring to manufacture cocaine, in violation of 21 U.S.C. § 846 (1982); count ten charged appellant with distributing cocaine hydrochloride, in violation of 21 U.S.C. § 841(a)(1) (1982); and count eleven charged him with possession of cocaine hydrochloride, in violation of 21 U.S.C. § 844(a) (1982).

Prior to trial, appellant moved to suppress the information seized in the search of his home, contending that the information providing probable cause for the search had been obtained in violation of his fourth amendment rights. Following a two-day evidentiary hearing, the magistrate filed a report and recommendation that appellant's motion be denied. The district court adopted the magistrate's report and recommendation with modifications.[6]

---

**2.** Surveillance was limited to nighttime activity for two reasons: first, the agents did not want to risk being seen and, second, it appeared that the laboratory activity normally occurred at night.

**3.** The manufacture of synthetic cocaine is an eight-stage chemical process. Some of the activities of the two Whaley brothers observed by the surveilling agents appeared to correspond to certain stages of this process. The progression of stages in manufacturing cocaine was corroborated, for example, when on February 10–11, 1983, Jonathan Whaley was observed pouring a white powder into a flask, frequently checking the temperature and adding ice to the area below the top of the flask. A DEA chemist noted that the "ice-bath procedure" resembled the fifth stage, the manufacture of 2-carbomethoxytropeinone. A few days later, agents spotted Jonathan Whaley's car at Rowlab, a local chemical supply company, and by looking into his car saw a box of test tubes with a Rowlab invoice. According to the DEA chemist, test tubes were

utilized in the sixth stage of manufacturing cocaine.

**4.** This was the fifth search warrant Agent Driver obtained. The first search warrant was issued on February 13, 1983, and Driver applied for a new warrant each time the previous warrant expired. The first four warrants were never executed for reasons not pertinent to this appeal.

**5.** This was a superseding indictment, the first indictment having been returned on April 19, 1983.

**6.** Much of the discussion in the magistrate's report and the district court's dispositive opinion focused on the DEA agents' use of binoculars in the surveillance. The magistrate concluded that, because the activities observed through binoculars were generally viewable through the naked eye, the use of binoculars was permissible. The magistrate held alternatively that the activity that could have been seen

Appellant's case was severed from the codefendants' cases, and he proceeded to trial. At the close of the Government's case in chief, the court granted appellant's motion for acquittal on count ten, charging distribution of cocaine hydrochloride. The jury thereafter acquitted him on count eleven, relating to the possession of cocaine hydrochloride, and the district court declared a mistrial as to count one, the conspiracy count, when the jury was unable to reach a verdict.

Appellant was retried on the conspiracy count. He did not dispute the Government's proof that he had operated a laboratory in his basement; what he disputed was that the laboratory was manufacturing cocaine. He contended that the lab was making an uncontrolled substance known as "open cocaine," and he presented a chemist who testified to that effect. The Government, anticipating this defense, presented a DEA chemist who testified that the processes underway in the laboratory indicated an attempt to manufacture synthetic cocaine, a controlled substance. In addition, the chemist testified that open cocaine had no known use and that the notes and formulas the DEA agents had found in appellant's basement laboratory provided no information for the production of open cocaine. The jury rejected appellant's explanation of his activity and found him guilty as charged. This appeal followed.

## II.

Appellant contends that the district court should have suppressed the evidence the DEA agents seized from the basement of his home because Agent Driver's affidavit, which led to the issuance of the search warrant, was based on information obtained in violation of the fourth amendment. Appellant argues that he had a reasonable expectation that any activity in his basement would be private and that the DEA agents therefore needed a search warrant to conduct their surveillance of his basement. Because the agents had no such warrant, appellant concludes that the information they gained from their surveillance, which Agent Driver presented in his affidavit, was tainted, rendering invalid the search warrant based on that affidavit.[7]

without the binoculars was sufficient to establish probable cause for the warrant, and he suggested striking from Agent Driver's affidavit the specific observations that could not have been seen without binoculars. The district court modified the magistrate's report to remove this alternative holding.

7. Appellant's argument overlooks the fact that Agent Driver's affidavit contained several pages of information obtained prior to the surveillance. Unquestionably, if sufficient untainted evidence was present in the affidavit to establish probable cause, the warrant was valid. *See United States v. Karo,* —— U.S. ——, ——, 104 S.Ct. 3296, 3305, 82 L.Ed.2d 530 (1984). Driver's affidavit alleged facts indicating (1) that chemicals and laboratory equipment necessary for the manufacture of cocaine had been ordered from a number of suppliers; (2) that many of the chemicals had been ordered under a false name; and (3) that the chemicals and equipment had been shipped to various addresses and later were consolidated at appellant's home. Under similar circumstances the Fifth Circuit, in *United States v. Fooladi,* 703 F.2d 180 (5th Cir.1983), found that probable cause to issue a search warrant existed. In *Fooladi,* the search warrant was supported by an affidavit showing that the defendant had purchased chemicals and laboratory equipment that could be used to manufacture amphetamines. The defendant had the materials shipped to a third party and then forwarded to him. There was also evidence that government agents smelled a chemical odor coming from a building on the defendant's property. After reviewing the affidavit, the Fifth Circuit concluded:

A citizen may purchase glassware and laboratory equipment for perfectly legitimate purposes. He may buy chemicals for legitimate purposes. He may even have products routed in a roundabout fashion innocently. However, we consider the evidence as a whole, and "[v]iewing the evidence in this manner it may truly be said that the total may be a sum greater than its parts." ... We conclude that there was probable cause to issue the warrant.

703 F.2d at 184 (citations omitted). Although there may be merit in an argument that Agent Driver's affidavit contained sufficient presurveillance information to justify the issuance of a warrant, we will assume for the remainder of our discussion that, absent the evidence obtained from the surveillance of appellant's basement, no probable cause to issue a search warrant existed.

■ Appellant's expectation that his basement would be private was based on the secluded nature of his home; he believed that his basement was so private that he could operate a cocaine laboratory in front of uncurtained windows. Appellant argues that such an expectation is protected by the fourth amendment, as interpreted by the Supreme Court in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Justice Harlan, in an often quoted concurring opinion in that case, provided a description of when fourth amendment protection is available:

> My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable." Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the "plain view" of outsiders are not "protected" because no intention to keep them to himself has been exhibited. On the other hand, conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable.

*Id.* at 361, 88 S.Ct. at 516. Our assessment of appellant's fourth amendment claim, therefore, depends not only on his subjective expectation of the privacy of his basement but also on the reasonableness of his expectation.

It is undisputed that appellant and his coconspirators engaged in an illegal activity in a lighted room directly in front of uncurtained windows. It is also undisputed that the activity could be viewed with the naked eye from a position on the canal or on neighboring property adjoining the canal. In similar situations, courts have held that surveillance of activities in a person's home from a location where the observer may properly be did not constitute a fourth amendment violation. *See United States v. Tarborda*, 635 F.2d 131, 138–39

(2d Cir.1980) (upholding unenhanced surveillance from an apartment across the street from defendant's apartment); *United States v. Christensen*, 524 F.Supp. 344, 347 (N.D.Ill.1981) (upholding binocular surveillance of illegal activity conducted in front of a window).

Appellant attempts to distinguish these cases because the homes involved were located in an urban setting. He argues that his expectation of privacy was reasonable because a reasonable person would not have anticipated that anyone would be in a position to look into his basement. To support this argument, appellant points to the fact that there were only two positions from which one could obtain a view into his basement—the canal and the location on the neighboring property used by the agents—and that access to these positions was extremely limited. Access to the canal was limited to those neighbors who possessed a key to the floating footbridge, and access to the surveillance location was limited to those who could obtain permission to enter from the owner of the neighboring property and who could negotiate the difficult route down the bank of the canal. Thus, appellant argues that, given the limited number of persons with access to a viewing position and the unlikelihood that any of them would actually occupy such a position, he had a reasonable expectation of privacy. We disagree.

■ Although appellant might have believed that activity in his basement would not be observed, a reasonable expectation of privacy "by definition means more than a subjective expectation of not being discovered." *Rakas v. Illinois*, 439 U.S. 128, 143 n. 12, 99 S.Ct. 421, 430 n. 12, 58 L.Ed.2d 387 (1978); *see also United States v. Christensen*, 524 F.Supp. at 346–47 (defendant's belief that observation was unlikely is irrelevant when illegal activity is conducted in front of a window facing a public street). As the Second Circuit stated in *United States v. Taborda*, 635 F.2d at 139 n. 10, "the reasonableness of an expectation of privacy [is] logically dependent

principally ... on the degree to which the locale is viewable by a member of the public without visual aids." Appellant concedes that on any day there was a possibility that a person could have been in a position to view the laboratory activity in his basement. Although this possibility was admittedly small for any given day, because the illegal activity occurred over a three-month period in the plain view of any person on the canal or on the neighbor's property the likelihood of discovery was substantially increased.

■ Appellant's argument ignores an additional fact that enhanced the likelihood of discovery. For several months prior to the DEA's surveillance, Jonathan Whaley had been buying the supplies necessary to manufacture cocaine and transporting them to appellant's residence. It was not unlikely that the police would notice such suspicious activity and commence an investigation that would lead to a surveillance of appellant's home, which, of course, is precisely what happened.[8] Given the duration of the activity in appellant's basement and the increased chance of discovery caused by the activities of coconspirator Jonathan Whaley prior to the DEA's surveillance, we believe that appellant could not have reasonably expected the activity in his basement to be private as long as he failed to cover his windows. He conducted his activity in plain view and consequently cannot contest the DEA's use of the information its agents obtained by looking through the basement windows.

■ Appellant argues that, even if the agents' visual surveillance was proper, the observations they made with binoculars were improper without a search warrant, and, therefore, those observations could not form the basis for the issuance of a warrant. The use of vision enhancing devices can taint an otherwise valid surveillance of the interior of a home when the devices allow the observer to view not only activities the homeowner should realize might be seen by unenhanced viewing but also the details of activities the homeowner legitimately expects will not be observed. *See United States v. Taborda*, 635 F.2d at 139 (distinguishing between telescopic observation and unenhanced observation); *cf. United States v. Agapito*, 620 F.2d 324, 330 (2d Cir.) (distinguishing between enhanced listening with electronic devices and unenhanced listening), *cert. denied*, 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980). In the surveillance in this case, however, the agents did not need binoculars to view the illicit conduct in appellant's basement. During the evidentiary hearing on appellant's motion to suppress, the magistrate heard testimony from the agents concerning their observations. The agents described which activities they could have observed without binoculars and which activities or objects could be seen only with the binoculars. In his report and recommendation to the district court, the magistrate found that, although the agents regularly used binoculars during the surveillance, the majority of the conduct described in Agent Driver's affidavit could have been viewed without visual aid. He suggested striking from the affidavit specific observations the agents could not have seen without visual aid; these observations, however, were few in number and constituted only minor details in the affidavit such as the color of a liquid in a test tube or the identity of small objects held by persons in the laboratory. The magistrate concluded, therefore, that ample probable cause existed to issue the search warrant even if the binocular assisted observations described in Agent Driver's affidavit were not considered. The district court modified the magistrate's report, concluding that such observations did not violate the fourth amendment and thus were properly considered in determining probable cause to issue the warrant.

8. We do not mean to imply that the mere fact that a person may be engaging in criminal conduct within his home destroys his expectation of privacy. Where it appears, however, that he has engaged in suspicious activity outside the home that would tend to attract the attention of the police, the reasonableness of the person's expectation of privacy is affected.

Appellant now contends that the binocular assisted surveillance of his home violated the fourth amendment and that *any* observation thus obtained should be stricken from Agent Driver's affidavit. Because the agents utilized binoculars throughout their surveillance, appellant concludes that none of their observations could be considered in determining probable cause to issue the search warrant. We disagree. It would make little sense to strike from the affidavit observations that could have been made with the naked eye just because an agent used binoculars to clarify his view. With a few minor exceptions all of the observations made by the agents could have been made with the naked eye, and we therefore believe that the observations were properly included in the affidavit. These observations in combination with other similarly unchallengeable information in the affidavit amply supported a finding of probable cause to issue the search warrant in question. The inclusion in the affidavit of details observable only with binoculars, therefore, constituted harmless error.

Thus, because we conclude that observations of activity in appellant's basement were properly included in Agent Driver's affidavit, we find that probable cause existed to issue the search warrant in question. Appellant's conviction is accordingly

AFFIRMED.

SIMPSON, Circuit Judge, dissenting:

I cannot agree with the majority.

It is hard to visualize circumstances falling more clearly within the "reasonable expectation of privacy" standards of *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), than those presented by this appeal.

The three months long nightly observation of Dr. Walker Whaley's home was a continuous warrantless search, violative of the Fourth Amendment.

The Whaley residence was located in a secluded area and its basement was impossible to see into from any place where strangers could be expected to be. In order to conduct their surveillance the government agents entered adjoining property and descended a wooded canal bank to a spot at the edge of a private canal. They were able from there, aided by the use of binoculars [1] to look into the Whaley basement windows which were not curtained.

The view obtained was poles apart from a constitutional plain view and not preclusive of a reasonable expectation of privacy.

I respectfully dissent.

---

1. The agents' testimony that they could see what went on without binoculars but chose to use them simply to observe details, sounds contrived and is unconvincing. The fact remains that binoculars were used nearly continuously.